ROGERS INDUSTRIAL PRODUCTS INC., Appellant,

v.

HF RUBBER MACHINERY, INC. et al., Appellees.

[Cite as *Rogers Indus. Prods. Inc. v. HF Rubber Mach., Inc.*, 188 Ohio App.3d 570, 2010-Ohio-3388.]

Court of Appeals of Ohio,
Ninth District, Summit County.

No. 25093.

Decided July 21, 2010.

John N. Childs and Christopher B. Congeni, for appellant.

John F. Hill; Mark R. Koberna and Daniel D. Domozick; and David M. Lowry, for appellee.

DICKINSON, Presiding Judge.

## INTRODUCTION

{¶ 1} Rogers Industrial Products Inc., a manufacturer of tire-curing presses, filed a complaint against a competing manufacturer and other defendants, alleging statutory and common-law claims that they misappropriated its trade secrets. Rogers alleged that the defendants had used confidential information about its tire-curing press to copy the unique design of its system for loading and unloading tires and that it had lost numerous sales as a result. Most of the defendants moved for summary judgment, asserting that the information about Rogers's press did not constitute trade secrets for several reasons, including that Rogers had disclosed the press design in a patent application that was published before the alleged misappropriation. The trial court granted summary judgment on the trade-secret claims on that basis and also found that the common-law claims had been displaced. We reverse the trial court's judgment on the claims for misappropriation of trade secrets because Rogers raised a genuine issue of material fact regarding whether its original patent application disclosed the

alleged trade secrets. We affirm the trial court insofar as it granted summary judgment to the defendants on Rogers's common-law claims, however, because Rogers failed to demonstrate that those claims were based on acts other than the alleged misappropriation of confidential information.

## FACTS

{¶ 2} During the early 1950s, Rogers started business as a manufacturer of pneumatic controls for tire-curing presses. Approximately 20 years later, its business expanded into rebuilding tire-curing presses with replacement parts purchased from the original manufacturers. Through their experience rebuilding other manufacturers' tire-curing presses, Rogers's engineers became familiar with the strengths and weaknesses of the industry's then-existing press designs. Over time, Rogers began redesigning and manufacturing some of the parts for the presses it rebuilt. By 1987, Rogers was designing and manufacturing entire machines.

{¶ 3} Rogers concentrated its design efforts primarily on manufacturing a more efficient device for loading and unloading tires and continued to make improvements to the loader and unloader mechanism of each press model it designed. It focused on making the movement of the tires more precise to maintain the tolerances of the tires during the curing process.

{¶ 4} Rogers manufactured a hydraulic tire-curing press for the first time around 1990 through a three-year license agreement with Krupp, a larger press manufacturer and the predecessor of Harburg–Freudenberger Maschinenbau GmbH. By building and marketing a press designed by Krupp, Rogers's engineers were able to detect flaws in its design. Rogers later designed its first hydraulic press and approached Goodyear Tire and Rubber Company, its primary customer since 1953, to market the novel design of its hydraulic press. In addition to believing that its loader and unloader operated more effectively than other models on the market, Rogers designed the press with the tire loader mounted on top of the press, rather than to the side. Its top-loading design allowed Rogers's press to operate in a smaller area than other tire-curing presses on the market at that time. Goodyear expressed an interest in the press, mainly because of its smaller "footprint." Goodyear intended to purchase 57 new hydraulic tire-curing presses for its plants around the country, but wanted to test the models of different manufacturers before it decided to purchase a particular model. During late 2002, Rogers agreed to build a prototype of its model H200T press and place it in Goodyear's plant in Lawton, Oklahoma. In addition to the prototype of the press, Rogers supplied Goodyear with written materials that included nine pages of detailed assembly drawings of the press, which Rogers had stamped "confidential."

{¶ 5} Goodyear considered purchasing presses from other manufacturers, including Krupp, and also tested their presses. The presses were set up in separate areas of the Lawton plant, where Goodyear ran tests for the next three or four months. During the testing period, Rogers heard from Goodyear employees that they preferred the Rogers press because it ran faster and had a longer bladder life than the presses of its competitors.

{¶ 6} Although Rogers had hoped that Goodyear would purchase all 57 presses from it, Goodyear ultimately purchased 40 presses from Krupp and only 17 presses from Rogers. Goodyear informed Rogers that it was purchasing more presses from Krupp because it was a larger manufacturer and could produce them faster. At about that same time, Krupp was purchased by another company, and its name was changed to Harburg–Freudenberger Maschinenbau GmbH. HF Rubber Machinery, Inc. ("HF") is Harburg–Freudenberger's U.S. subsidiary.

{¶ 7} Near the end of 2005, John Cole, the president and owner of Rogers, began hearing that the tire-curing press that Goodyear had purchased from HF looked like a "cousin" of the Rogers H200T press and not like the HF model that Goodyear had tested at its plant. Cole was concerned about the fact that HF had so quickly and drastically changed the design of its press and the fact that the new design of its loader and unloader was similar to the drawings Rogers had supplied Goodyear. He contacted Goodyear to investigate whether Rogers's unique press design could have been leaked to HF because Rogers had not revealed it to anyone else. Cole ultimately learned that during November 2004, James Bukowski, a Goodyear engineer, took nine pages of assembly drawings from the owner's manual of the Rogers H200T press and gave them to HF. Because Goodyear was impressed with Rogers's top-loading press design, Bukowski allegedly instructed HF to design a press that was similar to Rogers's drawings.

{¶ 8} Rogers filed this action against Bukowski and the HF defendants: Harburg–Freudenberger Maschinenbau GmbH; HF Rubber Machinery, Inc., and two HF employees, Ernest Els and Timothy Burton. It alleged that the defendants had misappropriated its trade secrets, that HF had copied the confidential design of Rogers's loader and unloader mechanism, and that Rogers had sustained damages as a result. Rogers further maintained that these actions constituted unfair competition, tortious interference with contracts or business relationships, and conversion.

{¶ 9} The HF defendants did not deny that they had possession of Rogers's assembly drawings. The primary dispute in this case was whether the information revealed in the drawings constituted trade secrets under Ohio's Uniform Trade Secret Act. The HF defendants eventually moved for summary judgment,

asserting that Rogers's assembly drawings and other information about its press did not constitute trade secrets. They further argued that Rogers's common-law claims had been displaced by the Uniform Trade Secrets Act because those common-law claims were based on alleged misappropriation of confidential information.

{¶ 10} The trial court granted summary judgment to the HF defendants on Rogers's claim for misappropriation of trade secrets, reasoning that Rogers had lost any trade-secret protection by disclosing its press design in a patent application that was published in February 2004, well before the alleged misappropriation of the information. The trial court also granted summary judgment to the HF defendants on the common-law claims, concluding that they had been displaced by the Uniform Trade Secrets Act. Rogers has appealed, assigning four errors to the trial court's judgment.

## DISCLOSURE THROUGH PATENT APPLICATION

{¶ 11} Rogers's first and second assignments of error are that the trial court incorrectly granted summary judgment to the HF defendants on its claim for misappropriation of trade secrets. In reviewing a trial court's ruling on a motion for summary judgment, this court applies the same standard a trial court is required to apply in the first instance: whether there are any genuine issues of material fact and whether the moving party is entitled to judgment as a matter of law. *Parenti v. Goodyear Tire & Rubber Co.* (1990), 66 Ohio App.3d 826, 829, 586 N.E.2d 1121.

■ {¶ 12} The HF defendants moved for summary judgment, asserting that Rogers's assembly drawings and other information did not constitute trade secrets under R.C. 1333.61(D). R.C. 1333.61(D) defines a trade secret as "scientific or technical information, design, process * * * or any business information or plans" that (1) derives independent economic value from not being generally known by competitors and (2) is subject to reasonable efforts to maintain its secrecy. R.C. 1333.61(D)(1) through (2).

{¶ 13} The HF defendants argued that the information at issue did not constitute trade secrets because (1) Rogers did not make a reasonable effort to maintain the secrecy of the information when it shared it with Goodyear, (2) Rogers disclosed the information in a patent application that was published before the alleged misappropriation, and (3) the information had no economic value to Rogers's competitors.

{¶ 14} Because the trial court granted summary judgment on the second argument, this court will consider it first. Rogers has argued that the trial court incorrectly concluded that the alleged trade secrets were disclosed in a patent

application for a locking device on its press that was published in February 2004. It has maintained that it presented evidence to raise a genuine issue of material fact about whether the confidential details of its loader and unloader design were disclosed in that patent application.

{¶ 15} The parties have not disputed that there is no trade-secret protection for confidential information that is disclosed in a published patent application. See *BondPro Corp. v. Siemens Power Generation, Inc.* (C.A.7, 2006), 463 F.3d 702, 706–707. "Once the information is in the public domain and the element of secrecy is gone, the trade secret is extinguished." *Stutz Motor Car of Am. v. Reebok Internatl.* (C.D.Cal.1995), 909 F.Supp. 1353, 1359. Trade-secret protection is not lost, however, for processes or specifications related to the device that are not disclosed in the published patent materials. *Allied Erecting & Dismantling Co., Inc. v. Genesis Equip. & Mfg., Inc.* (N.D.Ohio 2009), 649 F.Supp.2d 702, 713.

{¶ 16} The HF defendants asserted that Rogers disclosed the alleged trade secrets in an application for a patent on its press that was published in February 2004. Because the patent application included details about the design of the press, they argued that Rogers had disclosed the confidential design of its loader and unloader as of February 2004, almost nine months before the alleged misappropriation. They pointed to the 2008 deposition testimony of John Cole, in which he admitted, without giving any dates, that patent applications "have been filed * * * relating to the loader and unloader." The HF defendants also attached a copy of a patent application for a locking mechanism on the press that Cole filed in August 2002. The application indicates that it was published on February 26, 2004.

{¶ 17} Although the HF defendants failed to incorporate the patent application into an affidavit as required by Civ.R. 56(C), Rogers did not object to the trial court considering it. In fact, Rogers submitted the same patent application, also without a supporting affidavit, with its brief in opposition to summary judgment. Because the trial court considered the patent application, this court will do so, too. See *Richardson v. Auto Owners Mut. Ins. Co.*, 9th Dist. No. 21697, 2004-Ohio-1878, 2004 WL 785461, at ¶ 29.

{¶ 18} Through its brief in opposition to summary judgment, Rogers demonstrated that there were disputed material facts on this issue. It asserted that the 2002 patent application was for a locking mechanism on the press and that it disclosed only minimal information about the press's loader and unloader. As supporting evidence, Rogers attached an affidavit of John Cole, which clarified his earlier deposition testimony that had vaguely explained that Rogers had filed several patent applications pertaining to the press. At the time he was ques-

tioned by defense counsel, Cole had been unable to recall specific details about the information in each patent application or when each application was published. In his affidavit, he explained that the international patent application that was published in February 2004 "was only for a locking mechanism" and that "[t]he minimal disclosure as to how the locking mechanism applied to the loaders, unloaders, or green tire holders was far less detailed than the drawings misappropriated by HF and could not be used to recreate those proprietary mechanisms." Cole further stated that Rogers did not apply for a patent on the loaders, unloaders, and green tire holders for more than another year and that patent application was not made available to the public until June 22, 2006, 19 months after the alleged misappropriation of trade secrets.

{¶ 19} In their reply brief, the HF defendants raised two rebuttal arguments based on federal patent law, without citing any authority for applying that patent law to this trade-secret case. They maintained that even if Rogers's original patent application did not disclose the design details of the loader and unloader, (1) it should have, and (2) Rogers disclosed the design details in a later, continuation patent application and, because a continuation application relates back to the date of the original application for purposes of patent protection, the disclosure of Rogers's trade secrets related back to the publication of the original patent application. The trial court accepted the second argument.

{¶ 20} The law pertaining to the disclosure issue is clear: confidential information loses any trade-secret protection after it is disclosed to the general public in a published patent application. Rogers presented evidence to raise a genuine issue of material fact about whether its patent application that was published in February 2004 disclosed the alleged trade secrets. Whether any of Rogers's patent applications met the requirements of federal patent law is not relevant to that issue, as patent law has no bearing on Rogers's claim for misappropriation of trade secrets. The patent applications are relevant only as material facts of this case because they may ultimately establish when and the extent to which Rogers's published patent applications disclosed its alleged trade secrets. Although Rogers admittedly disclosed its press design in a patent application that was published in June 2006, there is no legal authority for deeming information to have been released to the public before it actually was. Consequently, the trial court incorrectly granted summary judgment on that basis.

## ALTERNATE SUMMARY–JUDGMENT GROUNDS

{¶ 21} Because the HF defendants raised two additional grounds for summary judgment, which the trial court explicitly considered, this court must review the other grounds and affirm the trial court's judgment if either of those grounds supported summary judgment for the HF defendants. See *McKay v. Cutlip*

(1992), 80 Ohio App.3d 487, 491, 609 N.E.2d 1272; *B.F. Goodrich Co. v. Commercial Union Ins.*, 9th Dist. No. 20936, 2002-Ohio-5033, 2002 WL 31114948, at ¶ 38–43 (refusing to review alternate grounds because the record affirmatively demonstrated that the trial court did not consider them). The HF defendants' two additional grounds for summary judgment were (1) that Rogers had failed to take reasonable steps to maintain the secrecy of its press design when it shared the information with Goodyear and (2) that the assembly drawings had no economic value to Rogers's competitors.

{¶ 22} The HF defendants asserted that Rogers failed to take reasonable steps to maintain the secrecy of its press design because it provided the prototype press and the nine pages of assembly drawings to Goodyear without executing any written agreement with Goodyear that required Goodyear to keep the press design secret. They pointed to the deposition testimony of John Cole, in which he admitted that Rogers had no written confidentiality agreement with Goodyear about the design of the press.

{¶ 23} Rogers responded to the summary-judgment motion by arguing that although it had no written confidentiality agreement with Goodyear, it had taken reasonable steps to protect the confidentiality of its press design through an oral or implied agreement with Goodyear to keep its press design confidential. See *Niemi v. NHK Spring Co., Ltd.* (C.A.6, 2008), 543 F.3d 294, 303 (following the reasoning of the Seventh Circuit that an oral confidentiality agreement between parties to a long-standing business relationship may be a reasonable means to protect confidentiality). Rogers presented evidence that it had built the prototype press solely for Goodyear and, at that time, did not show its press or share any information about it to anyone else. Rogers set up the prototype at Goodyear's plant in a location that was approximately 120 feet away from the HF model. According to Cole, he emphasized to Goodyear that he did not want any employees of the other manufacturers near Rogers's press. He explained that he was able to see the HF press only at a distance and that it was his understanding that Goodyear would not have allowed him to see the designs of the other manufacturers any closer.

{¶ 24} In addition to the prototype, Rogers provided Goodyear with an owner's manual that included the assembly drawings at issue. Rogers had stamped the drawings "confidential," and Cole testified that he believed that Goodyear would keep the press design confidential. He explained that Rogers and Goodyear had a longstanding business relationship dating back to the early 1950s. Rogers had spent months developing the prototype for Goodyear before it had any written commitment, based on its belief from past experience that Goodyear would honor its oral agreement. Cole further explained that during their many years of working together, Goodyear had always kept Rogers's drawings confidential.

Because Rogers demonstrated that there was a genuine issue of material fact as to whether it had taken reasonable steps to protect the confidentiality of its press design, the trial court correctly concluded that summary judgment on this ground was inappropriate.

{¶ 25} Finally, the HF defendants argued that the information in the assembly drawings did not constitute trade secrets because it had no economic value to Rogers's competitors. They cited *RF Technologies Corp. v. Applied Microwave Technologies, Inc.* (D.Me.2005), 369 F.Supp.2d 17, and *Rockwell Graphic Sys., Inc. v. DEV Industries, Inc.* (C.A.7, 1991), 925 F.2d 174, maintaining that both cases held that assembly drawings provide no economic value to competitors because they lack the detail necessary to enable a competitor to duplicate the product.

{¶ 26} The cases cited by the HF defendants did hold that the assembly drawings at issue in those cases lacked sufficient detail to provide an economic value to competitors, but each decision was based on the specific facts of the case and the assembly drawings at issue. See *Rockwell Graphic Sys., Inc.*, 925 F.2d at 176; *RF Technologies Corp.*, 369 F.Supp.2d at 22. In opposition to summary judgment on this ground, Rogers pointed to Cole's testimony as demonstrating that its assembly drawings were distinguishable from those in *RF Technologies* and *Rockwell* because they were drawn to scale and could be used to copy the design of individual parts or duplicate the entire design of Rogers's tire-curing press. The assembly drawings that Bukowski gave HF, Cole further explained, included the "absolute scale, dimensions, clearances, and actions of all moving parts" of the press and were "sufficiently accurate to allow Rogers'[s] press to be recreated without expending the significant cost and time required to develop such information." He further explained that the assembly drawings revealed Rogers's unique paddle mechanisms and how they operate, as well as the unique shape of the safety-bar arrangement on the loader. Rogers had spent years developing these designs and, according to Cole, a competitor could save great time and expense by using the drawings to duplicate its press design. The trial court correctly denied summary judgment on this basis because Rogers raised a genuine issue of material fact about whether its assembly drawings had independent economic value to its competitors.

{¶ 27} Because the HF defendants failed to establish that they were entitled to summary judgment on any of the grounds that they asserted, the trial court incorrectly granted summary judgment on Rogers's claim for misappropriation of trade secrets. Rogers's first and second assignments of error are sustained.

## DISPLACEMENT OF ADDITIONAL CLAIMS

{¶ 28} Rogers's fourth assignment of error is that the trial court incorrectly granted summary judgment to the HF defendants on its common-law

claims for unfair competition, tortious interference with contracts or business relationships, and conversion. Rogers has argued that the trial court ignored the evidence that it presented on summary judgment, particularly its evidence that the HF defendants had misused its confidential pricing information.

{¶ 29} The HF defendants moved for summary judgment on Rogers's additional claims, arguing that they were barred by R.C. 1333.67. R.C. 1333.67(A) provides that Ohio's Uniform Trade Secrets Act "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." This language was intended to prevent inconsistent theories of relief for the same underlying harm and has been interpreted to bar claims that are based solely on allegations of misappropriation of trade secrets or other confidential information. *Glasstech, Inc. v. TGL Tempering Sys., Inc.* (N.D.Ohio 1999), 50 F.Supp.2d 722, 730, citing *Powell Prods., Inc. v. Marks* (D.Colo.1996), 948 F.Supp. 1469, 1474–1475; *Smithfield Ham & Prods. Co. v. Portion Pac, Inc.* (E.D.Va.1995), 905 F.Supp. 346, 348; *Coulter Corp. v. Leinert* (E.D.Mo.1994), 869 F.Supp. 732, 734. "[P]laintiffs alleging theft or misuse of their ideas, data, or other commercially valuable information are confined to the single cause of action provided by the UTSA." *Hauck Mfg. Co. v. Astec Industries, Inc.* (E.D.Tenn.2004), 375 F.Supp.2d 649, 659.

{¶ 30} The HF defendants asserted that Rogers's remaining claims were barred by R.C. 1333.67(A) because each common-law claim was based on allegations that the defendants had misappropriated and misused Rogers's confidential and proprietary information. They pointed to Rogers's complaint that based each additional claim on allegations that the defendants had taken and misused Rogers's confidential information, including assembly drawings and other documents concerning the design of its tire-curing press, as well as cost and pricing information.

{¶ 31} Rogers's unfair-competition claim was based solely on allegations that the HF defendants "utilize[ed] Plaintiff's confidential and proprietary information" to gain an unfair competitive advantage. It based its claim for tortious interference with contracts or business relationships on allegations that the HF defendants had used its "confidential and proprietary information" to interfere with Rogers's business relationship with Goodyear. Likewise, its conversion claim was based on the alleged conversion of Rogers's "drawings and designs and confidential information."

{¶ 32} In opposition to summary judgment, Rogers merely pointed to evidence that its remaining claims were not just based on the single act of misappropriating the assembly drawings. It pointed to evidence that the other claims were based on repeated acts by the defendants and involved "other confidential trade secrets information" that the defendants wrongfully acquired, including Rogers's

cost and pricing information. Rogers did nothing more than demonstrate that there may have been more than one act of misappropriation and/or more than one type of confidential information at issue. It did not raise any factual issue that the additional actions against the HF defendants were based on anything other than the alleged misappropriation and misuse of its confidential and proprietary information. The trial court correctly concluded that Rogers's other civil claims had been displaced by Ohio's Uniform Trade Secrets Act. Rogers's fourth assignment of error is overruled.

## PUBLIC POLICY

{¶ 33} Rogers's third assignment of error is that the trial court's decision granting summary judgment on its trade-secrets claims violates public policy. Because this argument has been rendered moot by this court's disposition of Rogers's first and second assignments of error, it is overruled on that basis. See App.R. 12(A)(1)(c).

## CONCLUSION

{¶ 34} Rogers's first and second assignments of error are sustained, and its third and fourth assignments of error are overruled. The judgment of the Summit County Common Pleas Court is affirmed in part and reversed in part, and the cause is remanded.

Judgment affirmed in part<br>
and reversed in part,<br>
and cause remanded.

WHITMORE and MOORE, JJ., concur.