[Cite as *Tomaydo-Tomahhdo, L.L.C. v. Vozary*, 2017-Ohio-4292.]

# Court of Appeals of Ohio

### EIGHTH APPELLATE DISTRICT
### COUNTY OF CUYAHOGA

---

### JOURNAL ENTRY AND OPINION
### No. 104446

---

# TOMAYDO-TOMAHHDO L.L.C., ET AL.

### PLAINTIFFS-APPELLANTS

### vs.

# GEORGE VOZARY, ET AL.

### DEFENDANTS-APPELLEES

---

### JUDGMENT:
### AFFIRMED

---

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-15-840927

**BEFORE:** Stewart, J., McCormack, P.J., and Boyle, J.

**RELEASED AND JOURNALIZED:** June 15, 2017

**ATTORNEYS FOR APPELLANTS**

Daniel F. Lindner
Rick L. Ferrara
The Lindner Law Firm, L.L.C.
2077 East 4th Street, Second Floor
Cleveland, OH 44115


**ATTORNEYS FOR APPELLEES**

Julie L. Juergens
Melanie R. Irvin
Gallagher Sharp
Bulkley Building, 6th Floor
1501 Euclid Avenue
Cleveland, OH 44115

MELODY J. STEWART, J.:

{¶1} Plaintiff-appellant Rosemarie Carroll and defendant-appellee Larry Moore were partners in a restaurant venture called Tomaydo-Tomahhdo. The partnership ended when the parties signed a share purchase agreement in which Carroll bought out Moore and Moore agreed not to compete against Carroll for one year. When Moore's noncompetition agreement with Carroll expired, he opened a catering business, Caterology, and eventually entered into a partnership with defendant-appellee George Vozary, a former Tomaydo-Tomahhdo employee. Carroll brought this action in her own name and in the name of Tomaydo-Tomahhdo and other businesses that she owned, against Moore, Vozary, and their business, Clean Plate, Inc. d.b.a. Caterology, alleging that Moore breached the share purchase agreement by recruiting Vozary and that Moore and Vozary stole trade secrets (recipes, menu builds, and a customer list) and engaged in unfair competition. The court granted summary judgment to all defendants, finding that most of the claims against them were preempted by the Ohio Unfair Trade Secrets Act and that there was no evidence that the items allegedly misappropriated by Moore were trade secrets or used without authorization. The sole assignment of error on appeal contests various aspects of the summary judgment.

{¶2} Carroll and Moore formed their partnership in 2000. They began with a restaurant named Captain Tony's and expanded their holdings to include the restaurants Tomaydo-Tomahhdo and Tomaydo-Tomahhdo Express. They envisioned the

Tomaydo-Tomahhdo restaurant to be "kid friendly," "quick-service," and inexpensive, yet "upscale." In addition to dining, the restaurant provided a food-catering service.

{¶3} In 2004, Carroll and Moore hired Vozary. Vozary signed a confidentiality agreement in which he acknowledged that he would be exposed to "confidential information, including recipes, food preparation methods, marketing strategies, financial information and other trade secrets." Among other things Vozary agreed "not to discuss or disclose" were recipes, food preparation information, design models and schematics, and databases or documents containing customer information.

{¶4} Carroll and Moore's partnership ended in February 2008 when Moore agreed to sell Carroll his entire interest in the business entities by a share purchase agreement. In Section 6.1 of the agreement, Moore promised, among other things, that he would not use, disclose, convey, or reproduce "menu files and development ideas, recipes (current and historical) and training tools (picture boards, build sheets, prep lists, master order guide), materials that describe the Tomaydo-Tomahhdo concept[.]" Moore also promised in Section 6.2 of the agreement that "on or before January 2, 2010," he would not "induce or attempt to influence" any of Carroll's employees into entering into an employment contract with any other person or entity or "induce or attempt to influence" an individual or entity from terminating a relationship or contract that they, the individual or entity, had with Carroll. The parties specifically contemplated that Moore would be opening a restaurant in the 2008 fiscal year, so the agreement also required Moore to

provide Carroll with the location of the restaurant he intended to open and that Moore not open a restaurant in certain northeast Ohio communities before July 31, 2008.

{¶5} Moore opened a restaurant called Go Bistro in December 2008, but closed it in July 2010. Moore had several catering jobs pending when he closed Go Bistro, so he started another business, Caterology, that he operated from his house before moving to the back of a pizza shop.

{¶6} During the time Moore began operating Caterology, Vozary began looking to branch out with his own restaurant through a business called Clean Plate, Inc. Clean Plate did not open a restaurant; however, Moore hired Vozary to work at Caterology starting in April 2011. In June 2011, Moore and Vozary combined Caterology and Clean Plate, Inc. in a handshake agreement in which they became equal partners.

{¶7} In February 2015, Carroll and her business entities including Tomaydo-Tomahhdo, filed a complaint[1] in the common pleas court alleging that Moore, Vozary, and Caterology misappropriated Tomaydo-Tomahddo recipes and customer lists, engaged in unfair competition, tortiously interfered with current and prospective business relationships, and otherwise breached contracts and fiduciary duties. Moore, Vozary, and Caterology sought summary judgment on the grounds that the recipes were not trade

---

[1]Carroll previously filed suit against Moore, Vozary, and Caterology in the common pleas court and in federal court. In *Ketchup To Us, L.L.C. v. Vozary*, Cuyahoga C.P. No. CV-13-803631, the case was voluntarily dismissed. In *Tomaydo-Tomahhdo, L.L.C. v. Vozary*, N.D. Ohio No. 1:14 CV 469, 2015 U.S. Dist. LEXIS 10532 (Jan. 29, 2015), *aff'd*, 629 Fed. Appx. 658 (6th Cir.2015), the trial court granted summary judgment in favor of defendants on a copyright infringement claim and declined jurisdiction on state law claims.

secrets; that the civil conspiracy, tortious interference, unfair competition, and breach of fiduciary duty claims were subsumed within the misappropriation of trade secrets claim; and that they did not access the Tomaydo-Tomahhdo customer list. The court granted summary judgment, finding that most of the items included in the trade secrets claim were not trade secrets; that Carroll and Tomaydo-Tomahhdo failed to establish that Moore, Vozary, and Caterology actually acquired and used customer lists; that there was no proof that Moore and Carroll breached non-competition agreements; and that the remaining claims were preempted by trade secrets law.

{¶8} Our review of a case decided on summary judgment is de novo, conducting an independent review of the record and affording no deference to the trial court. Summary judgment is appropriate if the evidence properly before the court and viewed in a light most favorable to the nonmoving party shows that there are no genuine issues of material facts; the moving party is entitled to judgment as a matter of law; and reasonable minds can come to but one conclusion adverse to the nonmoving party. Civ.R. 56(C).

I. Misappropriation of Trade Secrets

{¶9} In order to prevail on a misappropriation-of-trade-secret claim, Carroll had to show by a preponderance of the evidence: (1) the existence of a trade secret; (2) the acquisition of a trade secret as a result of a confidential relationship; and (3) the unauthorized use of a trade secret. *Heartland Home Fin., Inc. v. Allied Home Mtge. Capital Corp.*, 258 Fed. Appx. 860, 861 (6th Cir.2008). Carroll premised her misappropriation of trade secret claims on the alleged theft of customer lists, picture

builds (pictorial representations of how to make a sandwich or salad), recipes, food preparation and training techniques, and marketing strategies and business models. The court found that, apart from customer lists, the remaining items did not meet the definition of a trade secret.

{¶10} The Ohio Uniform Trade Secret Act, R.C. 1333.61(D), defines a "trade secret" as:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:
>
> (1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.
>
> (2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

{¶11} When analyzing a trade secret claim, the court must consider:

> (1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information. (Citation omitted.)

*Salemi v. Cleveland Metroparks*, 145 Ohio St.3d 408, 2016-Ohio-1192, 49 N.E.3d 1296, ¶ 25.

A. Customer Lists

{¶12} Carroll alleged that Moore obtained her customer database prior to leaving the partnership and opening his restaurant. She maintains that Vozary and Moore had her computer consultant download her customer files onto a portable storage device and that they used the customer list to poach her catering customers. Acknowledging that a customer list can constitute a trade secret, *Salemi* at ¶ 26, the court found that Carroll failed to show that Moore and Vozary acquired the list as a result of a confidential relationship or that they used the customer list without authorization.

{¶13} The basis for the trade-secret claim relating to the customer list is Carroll's claim that the database file for her customer list showed that it had been accessed two weeks before Moore signed the share purchase agreement. A manager of Carroll's with expertise in the Tomaydo-Tomahhdo point-of-sale computer system testified at deposition and gave equivocal testimony about whether he copied the customer list to a portable storage device: at one point he testified that there was "no question that I had been asked to download or to convert the customer database into a CSV file and save it on a jump drive at some point," but at other points stated that it was "quite possible" that he exported the customer list or that he "very well may have" copied the customer list to a portable storage device. The manager stated that he could not testify that he copied the customer list and gave it to Moore. He likewise testified that "I don't think I ever physically handed [Vozary] a copy of the customer list on a flash drive."

**{¶14}** Moore denied that he had the manager download the customer list or that he ever possessed it. He did acknowledge that in fulfilling his obligations under the share purchase agreement, he placed Tomaydo-Tomahhdo information on a portable storage device and returned it to the manager. Moore denied talking to Vozary about copying the customer list. For his part, Vozary firmly denied that the manager ever gave him a portable storage device containing the Tomaydo-Tomahhdo customer list.

**{¶15}** Viewing the evidence most favorable to Carroll, *see* Civ.R. 56(C), shows that the Tomaydo-Tomahhdo computer file containing the customer list had been accessed. And although the evidence was equivocal, Carroll is entitled to have the evidence show that the consultant downloaded the customer list to a portable storage device. But the inferences end there. Carroll maintains that only she and Vozary had the computer password, that she did not authorize the manager to copy the customer list, so the consultant must have copied the data file for Vozary. That is speculation and is insufficient to meet the requirements of a properly supported motion for summary judgment.[2] *Waugh v. Lynch*, 8th Dist. Cuyahoga No. 100432, 2014-Ohio-1087, ¶ 12.

**{¶16}** Beyond speculation as to whether the manager gave Vozary the customer list, Carroll had to engage in additional speculation to show that Moore and Vozary used

---

[2] In an affidavit filed in support of her opposition to the motion for summary judgment, Carroll stated that the manager told her just prior to his deposition that he copied the customer list at Vozary's request and gave the portable storage device to Vozary. Moore and Vozary filed a motion to strike that statement on grounds that it was inadmissible hearsay. The court granted the motion to strike as unopposed and additionally noted that the manager had not been questioned about it by Carroll in his deposition. That ruling was not appealed.

the customer list without authorization. She reasoned that Caterology's rapid growth had to be the result of an exploitation of her customer database because (1) Moore opened the competing restaurant using the same point-of-sale system, (2) 25 percent of Caterology's customer base overlapped with that of Tomaydo-Tomahhdo, and (3) the rapid success of Caterology came despite it doing no advertising or marketing.

{¶17} Once again, the argument relies on speculation rather than facts. And it is speculation based on speculation — first, that Caterology had the customer database; and second, that Caterology's success is so implausible that it can only be explained if Caterology actually used the customer database. This is not evidence to show that Moore and Vozary had, and actually engaged in the unauthorized use of, the customer database.

## B. Picture Builds

{¶18} With regard to the picture builds, Carroll argues that the court erred by finding that picture builds were not trade secrets. In her deposition, she defined a "picture build" as "a photo of the end product of a menu item, the ingredients, the portions and the order that you build." The picture build would be posted near a work station in the kitchen so that an employee could consult it to make a consistent product.

{¶19} There was no evidence that the picture builds derived independent economic value from not being generally known to other persons who can obtain economic value from using those picture builds. At bottom, the picture builds showed how Carroll wanted her employees to make a sandwich or a salad. There was nothing proprietary about this because anyone, through observation, could easily ascertain the build order of

any Tomaydo-Tomahhdo sandwich. *Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg.*, 805 F.3d 701, 704 (6th Cir.2015), citing R.C. 1333.61(D).

**{¶20}** In addition, Moore gave uncontradicted evidence that he was not in possession of any Tomaydo-Tomahhdo picture builds. Carroll concedes the point — she testified in deposition that she did not know whether Moore took physical copies of the picture builds when he left Tomaydo-Tomahhdo. That concession led Carroll to claim that Moore must have the picture builds stored in his computer because he created them in the first place. This is pure speculation of a kind that cannot defeat a summary judgment motion. *United States Bank Natl. Assn. v. 3076 Representation Terrace Trust*, 10th Dist. Franklin No. 13AP-520, 2014-Ohio-2362, ¶ 21. The court did not err by finding that the picture builds were not trade secrets.

## C. Recipes

**{¶21}** Carroll does not specifically argue that Moore misappropriated her recipes for menu items. The law is clear that "lists of needed ingredients and directions for combining them" generally require no "expressive elaboration" or "minimal level of creativity." *Hassett v. Hasselbeck*, 177 F. Supp.3d 626, 632-633 (D.Mass.2016). In related litigation in this case, the United States Court of Appeals for the Sixth Circuit rejected Carroll's claim that Moore and Vozary infringed on any creative work in Carroll's recipe book for purposes of a federal copyright claim. *Tomaydo-Tomahhdo, L.L.C. v. Vozary*, 629 Fed.Appx. 658, 661 (6th Cir.2015).

**{¶22}** Instead, the legal basis for Carroll's claim is that specific food items she served — dinner rolls, pulled pork, lasagna, chicken parmesan, mac 'n cheese, spaghetti and meatballs, roasted redskin potatoes, potato salad, fresh fruit, pasta salad, sandwiches, brownies, and cupcakes — constituted trade secrets that Moore and Vozary copied when they served similar items on their catering menu. That Moore and Vozary served the same type of food that Carroll served was unremarkable because such items are typical catering fare. *Rib City Franchising, L.L.C. v. Bowen*, D.Utah No. 2:15-cv-00636, 2015 U.S. Dist. LEXIS 149797, 21 (Nov. 2, 2015); *Memory Integrity, L.L.C. v. Intel Corp.*, 178 F. Supp.3d 1022, 1037 (D.Or.2016). Carroll offered no evidence to show that her menu items were unique in a way that constituted a trade secret.

**{¶23}** Further defeating the trade secret claim is that Carroll admits there were differences in the ingredients that made up her menu items and those menu items served by Moore and Vozary: "Caterology food items that mimicked Tomaydo-Tomahhdo offerings were varied by one, possibly two ancillary item(s) in the ingredient list, but were otherwise the same." Appellant's brief at 17-18.

**{¶24}** What Carroll claims are "ancillary" ingredients were substantial components of the recipe. For example, Carroll argued that Caterology's Napa Valley turkey sandwich was a copy of her turkey focaccia sandwich. In her brief in opposition to the motion for summary judgment, she argued that "[t]he whooping [sic] differences between these 2 sandwiches are mozzarella v. provolone cheese, pesto mayo v. arugala [sic] mayo and balsamic v. cherry balsamic dressings." These were more than just minor

differences — the difference between arugula and pesto mayo is significant (one is a sauce/spread, the other a salad green). In other litigation between the parties, this same argument was rejected on grounds that "the test actually demonstrates that the food items served by defendants are different from those offered by plaintiffs." *Tomaydo-Tomahhdo, L.L.C.*, N.D.Ohio No. 1:14 CV 469, 2015 U.S. Dist. LEXIS 10532, at 11.

{¶25} We do not understand Carroll to argue that Caterology could not serve any kind of turkey sandwich. The district court came to the same conclusion: "[c]ertainly, plaintiffs cannot be suggesting that somehow the copyright prevents defendants from serving chicken salad sandwiches." *Id.* A turkey sandwich, in general, is nothing more than turkey held between two slices of bread. In this sense, every turkey sandwich is alike. The ways in which a sandwich-maker can vary a turkey sandwich is by use of different kinds of bread or condiments. Carroll conceded that if Caterology's menu items did not have the same ingredients, those items were "not exactly the same" as the items she served. This admission was fatal to her claim that Caterology copied her recipe.

{¶26} Carroll's concession that there were differences between her menu items and those offered by Moore and Vozary left her to argue that Caterology's dishes had the same "flavor profile" as her dishes. By this she meant that Moore and Vozary's menu items tasted "the same" as her menu items.

{¶27} In the catering world, a limited menu of food is prepared for large groups of people with varying tastes — this tends to make caterers resort to the least objectionable menu and ingredient options. To be sure, caterers like Tomaydo-Tomahhdo and Caterology pride themselves on serving food that tastes better than their competitors. But when the menu items are dinner rolls, pulled pork, lasagna, chicken parmesan, mac 'n cheese, spaghetti and meatballs, roasted redskin potatoes, potato salad, fresh fruit, pasta salad, sandwiches, brownies, and cupcakes, there is unlikely to be much variation in taste. So it is an unremarkable proposition that Caterology's eggplant parmesan might taste very similar to Tomaydo-Tomahhdo's eggplant parmesan.

### D. Food Preparation and Training Techniques

{¶28} Carroll offered no testimony to show that her food preparation and training techniques were secret. In fact, she offered no evidence to show what these techniques were, much less that they were secret. To the extent that Moore and Vozary gained knowledge in how to prepare food through their employment with Tomaydo-Tomahhdo, there was no showing that what they may have learned was different from what another kitchen employee would learn working in a different restaurant. "A person who enters employment as an apprentice and leaves it a master cannot be enjoined from developing or using the unique and advantageous materials and processes revealed to him in a confidential employer-employee relationship under substantial measures of secrecy." *Wiebold Studio Inc. v. Old World Restorations, Inc.*, 19 Ohio App.3d 246, 248, 484 N.E.2d 280 (1st Dist.1985).

## E. Marketing Strategies and Business Models

{¶29} Carroll maintains that Moore and Vozary misappropriated her marketing strategies and business models, but she offered no evidence in her opposition to the motion for summary judgment to show what those strategies and models were. Carroll acknowledged that Moore developed unique recipes for Tomaydo-Tomahhdo by "[t]aking ingredients that were available and combining them in a way I preferred." This is not a concept or strategy.

{¶30} The failure to identify the marketing strategies and business models was fatal — once Moore and Vozary supported their motion for summary judgment, Carroll had the obligation to set forth specific facts showing that there is a genuine issue of material fact for trial. *See* Civ.R. 56(E).

{¶31} It is uncontested that Caterology was not a restaurant, so it did not directly compete with Tomaydo-Tomahhdo's restaurant business. At best, Carroll's claim is that Moore and Vozary created a food catering business using what they learned when working for Tomaydo-Tomahhdo to start their own business. Moore and Vozary were not required to disregard the experience they gained in the food service industry when striking out on their own. *Wiebold Studio, Inc.,* 19 Ohio App.3d at 248, 484 N.E.2d 280 ("A former employee can use to his own advantage all the skills and knowledge of common use in the trade that he acquires during his employment."). There is no evidence that Moore and Vozary obtained and used Tomaydo-Tomahhdo's trade secrets to run their catering business.

## II. Civil Conspiracy, Tortious Interference, Unfair Competition, and Breach of Fiduciary Duty

**{¶32}** The court found that Tomaydo-Tomahhdo's claims for civil conspiracy, tortious interference, unfair competition, and breach of fiduciary duty were subsumed within its misappropriation of trade secrets claim consistent with R.C. 1333.67(A). That section states that the uniform trade secrets act displaces "conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." *See Rogers Indus. Prods. v. HF Rubber Mach., Inc.*, 188 Ohio App.3d 570, 2010-Ohio-3388, 936 N.E.2d 122 (9th Dist.); *Allied Erecting & Dismantling Co.,* 649 F.Supp.2d 702, 720 (N.D.Ohio 2009).

**{¶33}** Although Carroll and Tomaydo-Tomahhdo argued against preemption in their opposition to the motion for summary judgment, they raise no argument on appeal that the court erred by finding that their civil conspiracy, tortious interference, unfair competition, and breach of fiduciary duty claims were preempted. Their only reference to preemption appears in topic headings 7 and 8 of their brief, where they argue that the court erred by granting summary judgment on the civil conspiracy and unfair competition counts "if not preempted by the OUTSA." At oral argument, appellant's counsel conceded the issue. We therefore need not address it.

## III. Breach of Contract

**{¶34}** The court correctly recognized that preemption of the trade secrets act does not apply to contract claims, whether or not they are based on misappropriation of a trade secret. *See* R.C. 1333.67(B)(1). The court found that the breach of contract claim

regarding the misappropriation of trade secrets failed because there was no evidence that Moore retained any of the items listed in the share purchase agreement. The court also found that Moore did not violate the terms of the noncompetition clause when he opened a restaurant after leaving Tomaydo-Tomahhdo. Finally, the court found that Moore did not hire Tomaydo-Tomahhdo employees in violation of the share purchase agreement.

A. Theft of Customer Database

**{¶35}** A breach of contract claim consists of (1) a binding contract or agreement; (2) the nonbreaching party performed its contractual obligations; (3) the other party failed to fulfill its contractual obligations without legal excuse; and (4) the nonbreaching party suffered damages as a result of the breach. *Telecom Acquisition Corp. I v. Lucic Ents.*, 2016-Ohio-1466, 62 N.E.3d 1034, ¶ 23 (8th Dist.).

**{¶36}** In the share purchase agreement, Moore agreed that he would return to Carroll all current and updated graphic design files, videos, photographs taken by Moore or a party approved by him, menu files and development ideas, recipes (current or historical) and training tools (picture boards, build sheets, prep lists, master order guide), and materials that describe the Tomaydo-Tomahhdo concept, its goals and/or strategies.

**{¶37}** As noted earlier in our discussion of the trade secrets claim, Carroll offered no evidence to show that Moore remained in possession of any of these items. Moore testified at deposition that he returned all Tomaydo-Tomahhdo items in his possession. Carroll offered no evidence in rebuttal, just speculation that Moore continued to retain certain items. As a matter of law, this aspect of the contract claim failed.

**{¶38}** We likewise reject the claim that Moore copied the Tomaydo-Tomahhdo business model and "concept." The most obvious difference between Tomaydo-Tomahhdo and Caterology is that Tomaydo-Tomahhdo is primarily a restaurant, whereas Caterology is a catering service. Even though both businesses offer similar menu items, nothing in the share purchase agreement prohibits Moore from offering menu items that are similar to those offered by Tomaydo-Tomahhdo.

### B. Enticing Employees

**{¶39}** In the share purchase agreement, Moore also promised that he would not:

(2) induce or attempt to influence any then-current employees or representatives of [Tomaydo-Tomahhdo] to enter into any employment contract relationship with any other person or entity; or (3) induce or attempt to induce an individual or entity from terminating a relationship or contract with [Tomaydo-Tomahhdo].

**{¶40}** Tomaydo-Tomahhdo claimed that Moore induced three of its employees to leave and join Caterology: Vozary, David Porter, and Timothy Spock. Porter and Spock were intertwined — Carroll claimed that Porter told her that he had been contacted by Spock about working for Moore at the restaurant he opened after leaving Tomaydo-Tomahhdo. This assertion was a subject of Caterology's unopposed motion to strike on grounds that it was inadmissible hearsay.[3] The court ordered that assertion stricken, and Tomaydo-Tomahhdo does not challenge that order on appeal. With the

---

[3]Actually, Carroll's claim that Moore breached the share purchase agreement by using Spock to recruit Caterology's employees relies on hearsay upon hearsay: Porter told Carroll what Spock told Porter.

statement stricken, it cannot serve as evidence that Moore breached his agreement not to entice Tomaydo-Tomahhdo employees to come work with him.

{¶41} Carroll's evidence with respect to the recruitment of Vozary consists of telephone records showing that Moore and Vozary spoke "hundreds of times" after Moore signed the share purchase agreement and Vozary continued to work for Tomaydo-Tomahhdo. Moore and Vozary both denied that the telephone calls involved Moore trying to recruit Vozary. They explained that they were friends and Moore gave Vozary a car in exchange for Vozary agreeing to perform home remodeling work for Moore, so the telephone calls were, among other things, related to the remodeling work.

{¶42} Without any contrary evidence on the content of the telephone calls, Carroll can only speculate that the subject of these many telephone calls was Moore's attempt to recruit Vozary. But even if Carroll might be entitled to an inference that the number of telephone calls proved that Moore had been attempting to recruit Tomaydo-Tomahhdo employees, that inference evaporated because Vozary did not leave Tomaydo-Tomahhdo until March 2011 — more than three years after Moore signed the share purchase agreement.

{¶43} This was not a case where the telephone calls were made days before Vozary quit Tomaydo-Tomahhdo; had that been a fact, it might be reasonable to infer that Vozary's quitting was connected to some form of recruitment. By the time Vozary left Tomaydo-Tomahhdo, the restrictions on Moore with regard to influencing Tomaydo-Tomahhdo employees had been expired for more than a year.

Tomaydo-Tomahhdo's argument requires us to believe that Moore was recruiting Vozary, albeit unsuccessfully, for well more than a year in advance of when Vozary actually decided to quit. This is not a reasonable inference.

{¶44} Finally, Tomaydo-Tomahhdo claimed that Moore violated the share purchase agreement by going to the Tomaydo-Tomahhdo parking lot in violation of his promise not to "enter any of the Entities, which included future locations." The court found that the lot is a public parking lot not owned or controlled by Tomaydo-Tomahhdo, so Moore did not breach the agreement. We agree with this conclusion and further note that Moore explained that he only went to the parking lot to return the Tomaydo-Tomahhdo information in his possession as agreed to in the share purchase agreement. He said he chose the parking lot "because I can't go in the store." Even if Tomaydo-Tomahhdo owned the parking lot in question, Moore's presence there would have been legally excused by his duty to return the information in his possession.

{¶45} Judgment affirmed.

It is ordered that appellees recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, JUDGE

TIM McCORMACK, P.J., and
MARY J. BOYLE, J., CONCUR