NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0360n.06

No. 23-3596

METRON NUTRACEUTICALS, LLC,

    Plaintiff-Appellant,

v.

CHRISTINA RAHM COOK; ROOT WELLNESS, LLC; DC2 HOLDINGS, LLC; CLAYTON THOMAS; DR. CHRISTINA RAHM, LLC; DR. CHRISTINA RAHM VENTURES INCORPORATED; CURE THE CAUSES, INC.; MERCI DUPRE, LLC; MARK E. ADAMS; ENTOX SOLUTIONS, LLC; TOP PARTNERS MANAGEMENT, LLC; SIMPLY WHOLEISTIC, INC.; DC2 HEALTHCARE, LLC,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**
Aug 20, 2024
KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO

OPINION

---

Before: GIBBONS, WHITE, and THAPAR, Circuit Judges.

**HELENE N. WHITE, Circuit Judge**. Plaintiff-Appellant Metron Nutraceuticals, LLC (Metron) brought claims for breach of contract and trade-secret misappropriation in violation of the Ohio Uniform Trade Secrets Act (OUTSA), Ohio Rev. Code Ann. §§ 1333.61–1333.69, against Defendants-Appellees, its former business associates and their companies. The district court granted summary judgment for Defendants on all claims, concluding that (a) the breach-of-contract claim was preempted by the OUTSA, (b) the OUTSA claim was time-barred against two Defendants, and (c) the OUTSA claim failed on the merits against the remaining Defendants because the allegedly misappropriated information did not meet the statutory definition of a trade secret. We **AFFIRM** the grant of summary judgment for Defendant-Appellee Root Wellness, LLC, and otherwise **REVERSE** and **REMAND** for further proceedings consistent with this opinion.

**I.**

## A. Metron's Patent Applications

Metron's co-founder, president, and current majority owner, Dr. Nicholas Tsirikos-Karapanos, developed the purported trade secret at issue in this case: an unpublished patent application describing a process for creating nutritional supplements containing zeolite clinoptilolite fragments. Tsirikos-Karapanos holds an M.D., a PhD in cardiovascular surgery, and a PharmD; he is also a board-certified pharmacist in Europe. In 2013, prior to forming Metron, Tsirikos-Karapanos worked as chief scientist and medical director at LifeHealth Science (LHS), a dietary-supplement company that sold several clinoptilolite-based products.[1] LHS's clinoptilolite products, like others on the market, are clinoptilolite suspensions. While working there, Tsirikos-Karapanos began exploring the possibility of creating a clinoptilolite solution, rather than a suspension. He considered a solution product superior to a suspension because suspensions are mixtures and the solids settle, but the particles in a solution remain suspended. So, Tsirikos-Karapanos began using LHS's equipment, which he considered "limited and very low quality," to conduct experiments in methods to make water-soluble clinoptilolite. R. 156-1, PID 4890.

In June 2014, Tsirikos-Karapanos believed he had successfully created water-soluble clinoptilolite, which he referred to as "hydrolyzed clinoptilolite fragments" (HCF). He approached LHS's owner, Bert Moyar, about developing a product containing HCF, but Moyar wanted to monetize HCF immediately by selling to a multi-level marketing company instead. Defendant Clayton Thomas, then a commission salesperson at LHS, suggested the company Jeunesse Global

---

[1] Clinoptilolite is a "non-water soluble, non-bioabsorbable salt" that, due to its "three-dimensional (3D) honeycomb configuration," can "attract and retain several heavy metals in vitro." R.156-1, PID 5301. It has therefore been "used for decades as [the] main compound in commercially available filters in various applications ranging from household water filtration to oil industry gas filtration." *Id.*

as a potential buyer. Moyar, Tsirikos-Karapanos, and Thomas met with Jeunesse in August 2014 to explore creating an HCF product after appropriate testing and development. Jeunesse accepted, but insisted the three form a new entity because LHS was in bankruptcy. Ultimately, Tsirikos-Karapanos and Thomas formed Metron, without Moyar, on October 9, 2014, each holding a 44.5 percent ownership interest.

Also on October 9, Metron filed a provisional patent application with the United States Patent and Trademark Office (USPTO), describing the process Tsirikos-Karapanos developed at LHS. On December 31, 2014, it filed a non-provisional patent application pursuant to the Patent Cooperation Treaty with the USPTO's international branch (PCT Application). The PCT Application describes "[p]ractically" the same process as the provisional application and claimed the October 9 priority date. *Id.*, PID 4932–33. If a non-provisional PCT application claims priority to the filing date of a provisional application, as Metron's PCT Application did, the PCT application will publish, and the provisional application will become publicly available eighteen months after the provisional application's filing date. Accordingly, the PCT Application was published on April 14, 2016. According to Tsirikos-Karapanos, only he, Metron's intellectual property attorney, and Thomas—who was once copied on an email between the two that included the application as an attachment—had access to the PCT Application before its publication.

As Tsirikos-Karapanos continued experimenting at Metron, now using high-quality equipment, it became apparent that the process developed at LHS and described in the PCT Application merely created a "good suspension." *Id.*, PID 4891. Tsirikos-Karapanos began working on new formulations from scratch and, after two-and-a-half months, developed a process for creating the hydrolyzed "water-soluble clinoptilolite fragments" necessary to create a solution. *Id.* This process differed from the one described in the PCT Application—that process was a two-

step hydrolysis process over three days, the new one was "a one-step hydrolysis [process that] takes place in two days." *Id.*, PID 4918.

Metron filed a non-provisional utility patent application and a second PCT application describing the new one-step process on October 9, 2015. These patent applications claimed priority back to October 9, 2014, the provisional application's filing date, on the basis that the content of the earlier application was the "foundational basis" for the new applications. *Id.*, PID 4968. Currently, Metron holds three U.S. patents related to the production of hydrolyzed clinoptilolite fragments. After developing the one-step process, Metron never used the two-step process to make its products.

### B. Cook and Adams's Involvement with Metron

Defendant Christina Rahm Cook began exploring a business relationship with Metron in April 2015 after meeting Thomas.[2] Cook holds a Master of Science degree in rehabilitation counseling and a Doctor of Education degree in counseling psychology, has studied nutrition and pharmaceuticals, and has worked as a consultant for biotechnology and pharmaceutical companies. Thomas wanted to work with Cook on making a CBD and zeolite product, and sent her "a huge packet of information." R.156-2, PID 5646. Cook testified that she believed the documents Thomas sent her included patented information, including a patent she understood to have "c[o]me from another company, but Metron was going to file it." *Id.*, PID 5647.

In July 2015, Thomas arranged for Cook and several others he believed could help sell Metron's products to tour Metron's Cleveland headquarters. Before their visit, Tsirikos-Karapanos required the attendees, including Cook, to execute "Mutual Confidentiality

---

[2] Cook and Thomas married in 2019.

Agreements" (MCAs). The MCAs set "the terms and conditions by which each party agrees to disclose certain of its Confidential Information to the other party for the sole purpose of evaluating the possibility of future business relationships between the parties ( . . . 'The Evaluation'.)" R.3-1, PID 166. The MCAs define confidential information to include "any and all information . . . which is disclosed for the purpose of The Evaluation," including techniques, processes, procedures, and information provided by Metron referencing its products and product-related processes. *Id.* The MCAs require the parties to "protect the confidentiality" of the defined confidential information, restrict access to it to "personnel engaged in use required by The Evaluation," and prohibit copying or reproduction of confidential information "without the disclosing party's prior written consent." *Id.* at 166–67.

Cook and the other attendees toured Metron's facilities, went out to dinner with Tsirikos-Karapanos, and had a meeting the next morning. According to Cook, Tsirikos-Karapanos showed her a document Thomas had previously sent her that might have been a patent application. According to Tsirikos-Karapanos, he did not show any of the attendees documents relating to the production of hydrolyzed clinoptilolite fragments. Following the visit, Metron and Cook did not do business together.

Defendant Mark Adams also became involved with Metron through Thomas. In June 2015, Thomas approached Adams, then the CEO of multi-level marketing company SOZO Global, Inc. (SOZO), about selling Metron's zeolite products. Thomas stopped working at Metron and relinquished part of his equity as of August 25, 2015. On August 31, after he left the company, Thomas and Metron executed an MCA with identical terms to the one Cook signed. On September 24, 2015, Adams and Thomas entered into a patent, trademark, and supply agreement that Adams believed Thomas was signing on Metron's behalf.

Tsirikos-Karapanos learned of the purported contract with SOZO for the first time on October 4, 2015, when Adams called him to discuss the agreement. Tsirikos-Karapanos informed Adams that Thomas lacked authorization to act on Metron's behalf, and that the agreement was therefore invalid. Adams expressed a desire to enter into a proper agreement between Metron and SOZO, and Tsirikos-Karapanos insisted that he first execute an MCA. From October 6 to approximately October 15, Adams repeatedly called Tsirikos-Karapanos with questions about Metron's technology, and Tsirikos-Karapanos answered his questions "freely and openly." R.156-1, PID 5173–74. During these discussions Tsirikos-Karapanos told Adams that Metron had filed a provisional and an international patent application, and gave him the application numbers.

On October 30, 2015, Metron and SOZO executed an exclusive distribution and supply agreement, and an MCA with an effective date of October 6, 2015. Adams signed both documents on SOZO's behalf, as its chairman and CEO. The distribution agreement gave SOZO the exclusive right to sell Metron's Renew HC product, a solution of hydrolyzed clinoptilolite fragments with vitamin C. Thomas joined SOZO as a product manager for Metron's product with, according to Adams, Metron's permission.

Parallel to his agreement with Metron, Adams began working with Thomas and Cook to obtain a potential second source of supply for clinoptilolite products. Thomas introduced Cook to Adams in September or October 2015, and she represented to him that "she could make a product in a way that it had never been made before." R.155-2, PID 4162. According to Adams, he repeatedly stressed to Cook and Thomas the importance of creating "truly a novel, unique invention" that did not use another company's information. *Id.*, PID 4267. Cook assured him she wanted to "do this the right way but quickly," and would not "use any property of anyone else just what I have proven on the product." *Id.*, PID 4449. Although she stated she would not "steal an

existing patent," she told Adams she was "allowed to use any posted provisional theory or patent [because] that is what we do." *Id.*

## C. The Cook-EnTox Patent

Adams, Thomas, and Cook met at SOZO's offices on October 14, 2015. By that point, Adams and Thomas were interested in having Cook draft a patent application. Adams also formed a new entity, EnTox Solutions, LLC (EnTox), "as a means of writing this patent," and made Cook a member as compensation. *Id.*, PID 4174. Cook later executed a contribution agreement assigning EnTox her rights in any zeolite-related intellectual property. Top Partners Management, LLC (Top Partners), an entity Adams is a member of, is the sole manager of EnTox.

Cook testified that although she did not come to the meetings planning to draft a patent, she brought a "huge . . . stack" of documents and research with her. R.156-2, PID 5654. Cook ultimately did draft a patent during the meetings. Although Adams hired a patent attorney to help with filing the patent, Cook testified that she drafted the application without assistance. In drafting the application, she referenced the documents she brought with her. Cook testified that she informed the attorney that some of the documents were Metron's.

EnTox filed a non-provisional patent application on October 14, 2015, and it filed revisions to the application and a second non-provisional patent application on October 15 (Cook-EnTox Patent Application). The applications list Cook as the inventor. The Cook-EnTox Patent Application became publicly available on April 20, 2017. On January 19, 2021, the USPTO issued a patent based on the Cook-EnTox Patent Application, titled "Water-Soluble

7

Electrolyzed/Solvolyzed Clinoptilolite Fragments and Nutraceutical, Pharmaceutical, and Environmental Products Based Thereon" (Cook-EnTox Patent). *Id.*, PID 5894.[3]

According to Metron, seventy-two sections of the Cook-EnTox Patent are copied verbatim or nearly verbatim from Metron's PCT Application. Some of the copied sections appear in the portion of the Cook-EnTox Patent summarizing Cook's invention, others merely provide scientific background, *e.g.*, describing the molecular structure of clinoptilolite. But the Cook-EnTox Patent Application reproduces the two-step process described in Metron's PCT Application. Metron's application describes a three-day hydrolysis process, as does the Cook-EnTox Patent. The "Day 1" process in the Cook-EnTox Patent builds on the one described in Metron's application—while Metron's Day 1 process utilizes only a "Primary Hydrolysis Reaction," the Cook-EnTox Patent utilizes either a primary hydrolysis reaction or four alternatives. *See* R.156-1, PID 5385; R.156-2, PID 5902. But the primary hydrolysis reaction in the Cook-EnTox Patent closely replicates the one in Metron's application, with the parameters slightly tweaked to "non-precise numerical ranges that include[] the quantities set forth in Metron's [p]atent [a]pplication." R.96, 2849 (emphasis omitted). So, for example, where Metron's reaction uses of 6,375 grams of zeolite clinoptilolite, the Cook-EnTox Patent uses "± 7,000 g." *Id.* And rather than setting a heating plate to 1200 degrees, as Metron's application directs, the Cook-EnTox Patent recommends a setting "between 1000 and 1500" degrees. *Id.* The Cook-EnTox Patent reproduces Metron's Day 2 and Day 3 processes in substantively identical, and frequently verbatim, terms. However, the Cook-EnTox Patent's claims, which define the scope of the invention, differ from the claims in Metron's PCT Application.

---

[3] The issued patent lists its filing date as October 15, 2015, and is a "[c]ontinuation-in-part" of an application filed on October 14, 2015 and later abandoned. R.156-2, PID 5894.

Shortly after the Cook-EnTox Patent was issued, Metron filed a request for ex parte reexamination. Metron argued that the claims in the Cook-EnTox Patent were "obvious and unpatentable" in light of Metron's PCT Application and two other existing patents. R.154-10, PID 3560. On reexamination, the USPTO initially rejected the Cook-EnTox Patent's claims, but later reversed and confirmed their patentability following responses from EnTox.

## D. Metron and Defendants' Clinoptilolite Products

Following the drafting of the Cook-EnTox Patent Application, Adams's business relationship with Cook and Thomas broke down, and EnTox ultimately did not produce a clinoptilolite product.

In 2016, Metron attempted to sell Renew HC (later marketed as ClearDrops) with SOZO as its distributor. After SOZO failed to pay its full invoice for a shipment of Renew HC it ordered from Metron, Metron began trying to find a new distributor in May 2016. However, according to Tsirikos-Karapanos, its ability to do so was "significantly hindered" by competition from another clinoptilolite product, Vitality Detox Drops. R.165-2, PID 7061.

According to Thomas, Cook created the formula for Vitality Detox Drops, and he came up with the name, helped design its label, submitted a trademark application for its name and logo, and initially manufactured it. In 2019, Thomas formed Bootheel Lab Corporation, which acquired manufacturing and distribution rights to Vitality at the end of 2019 from Cook or "one of [her] entities." R.155-3, PID 4603. Vitality is now manufactured by Alternative Labs.

Thomas created another entity, Root Wellness, LLC (Root), in 2019. Cook is the "scientist behind Root," formulates its products, and is actively involved in its business. *Id.*, PID 4514. She also receives a dollar for every product Root sells.

Root began selling the clinoptilolite product Clean Slate in 2020. Thomas testified that the formulas for Vitality Detox Drops and Clean Slate are "the same" or "very, very, very similar." *Id.*, PID 4492. Alternative Labs also manufactures Clean Slate. *Id.*, PID 4582. However, according to Cook, if Clean Slate "uses one of [her] supplied formulas, then it does not contain clinoptilolite." R.161-1, PID 6605.

According to Metron, Clean Slate has also hindered its sales. Although Metron found a new distributor, ZOI Global, LLC (ZOI), in 2020, competition from Clean Slate and Vitality Detox Drops has reduced ZOI's sales of ClearDrops and required Metron to waive ZOI's minimum purchase requirements. Sales of ClearDrops are particularly harmed by Defendants' ability to market Vitality and Clean Slate as "Patent Pending" and "Patented," because ClearDrops's own patented status is "[o]ne of [its] strongest marketing points." R.166-1, PID 7068.

## II.

Metron filed suit against Cook, Thomas, Root, and other associated corporate entities in the Cuyahoga County Court of Common Pleas on July 13, 2020. After Defendants removed the case, Metron filed an Amended Complaint, adding Adams, EnTox, Top Partners, and other corporate entities as defendants and bringing claims for trade-secret misappropriation in violation of the OUTSA, breach of contract, tortious interference, and fraudulent misrepresentation.

Defendants filed a joint motion for summary judgment. Metron filed a response that, in addition to opposing Defendants' motion, requested the dismissal of various claims and defendants. The district court granted this request, leaving two claims against six defendants: (1) trade-secret misappropriation in violation of the OUTSA against Cook, Thomas, Adams, Root, EnTox, and Top Partners; and (2) breach of contract against Adams, Cook, and Thomas. Metron also dropped its request for injunctive relief under the OUTSA.

The district court granted summary judgment in favor of Defendants on both claims. Metron now appeals.

## III.

This court reviews a district court's decision to grant summary judgment de novo. *George v. Youngstown State Univ.*, 966 F.3d 446, 458 (6th Cir. 2020). The moving party must establish that there is "no genuine dispute as to any material fact" and it is "entitled to judgment as a matter of law," Fed. R. Civ. P. 56(a), which requires showing that no "reasonable jury could return a verdict for the nonmoving party," *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In response the nonmoving party must use "specific facts" to demonstrate that there is "a genuine issue for trial"; otherwise, summary judgment is warranted. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quotation omitted). "In considering" a summary judgment motion, "the court must view the evidence and draw all reasonable inferences in favor of the nonmoving party." *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003).

## IV.

Metron brings a breach-of-contract claim against Cook, Thomas, and Adams for violating the terms of their MCAs, which required the parties to protect each other's confidential information and prohibited copying confidential information without consent. Under Ohio law, "a claim for breach of contract requires plaintiff to prove: 1) the existence of a contract; 2) performance by the plaintiff; 3) breach by the defendant; and 4) resulting damages to the plaintiff." *Zipkin v. FirstMerit Bank N.A.*, 176 N.E.3d 86, 95 (Ohio Ct. App. 2021).

The district court did not reach the merits of Metron's claim, instead finding it preempted by the OUTSA. Metron argues that this was error. Defendants argue that the district court

correctly found the breach-of-contract claim preempted and, additionally, that Metron failed to establish other elements of its claim.

## A. Preemption by the OUTSA

The district court concluded Metron's breach of contract claim was preempted by the OUTSA because it shared operative facts with Metron's misappropriation claim and sought remedies available under the statute. Because this conclusion stemmed from a flawed interpretation of the OUTSA's preemption provision, summary judgment should not have been granted on this basis.

The OUTSA "displace[s] conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." Ohio Rev. Code Ann. § 1333.67(A). But this preemption provision contains certain exemptions—it "do[es] not affect," *inter alia*, "[c]ontractual remedies, whether or not based on misappropriation of a trade secret." *Id.* § 1333.67(B)(1). Although the Ohio Supreme Court has not yet addressed the issue, the Ohio Court of Appeals has, without analysis, interpreted the statute to exempt breach-of-contract claims from preemption. *See Tomaydo-Tomahhdo LLC v. Vozary*, 82 N.E.3d 1180, 1189 (Ohio Ct. App. 2017) ("[P]reemption of the trade secrets act does not apply to contract claims, whether or not they are based on misappropriation of a trade secret."); *see also Key Realty, Ltd. v. Hall*, No. L-19-1237, 2021 WL 73856, at *5 (Ohio Ct. App. Jan. 8, 2021) ("Appellant's breach of contract claim is not precluded by its misappropriation of trade secrets claim."), *vacated on other grounds and superseded on reconsideration*, 173 N.E.3d 831 (Ohio Ct. App. 2021). So too have district courts applying Ohio law. *See, e.g.*, *Kendall Holdings, LTD. v. Eden Cryogenics, LLC*, No. 2:08-cv-390, 2010 WL 389416, at *6 (S.D. Ohio Sept. 29, 2010) ("Thus, if Count IV establishes a contract claim, it is not displaced by § 1333.67.").

The district court focused on the difference in terms used in Section 1333.67(A), which preempts "tort, restitutionary, and other *laws*," and Section 1333.67(B)(1), which excludes from preemption "[c]ontractual *remedies*." This difference, according to the district court, means that "the savings clause in subsection (B)(1) does not extend as far as the general preemption in subsection (A)." R.171, PID 7257. Accordingly, the district court determined that Section 1333.67(B)(1) "only exempts from preemption contractual remedies that differ from those available under the [OUTSA]." *Id.* And because the MCAs provide for remedies the OUTSA also makes available, *see* Ohio Rev. Code Ann. § 1333.62, the district court held that the breach-of-contract claim was preempted.[4]

Because the Ohio Supreme Court has not yet addressed whether the OUTSA preempts contract claims, the district court was required to "predict how the [state supreme] court would rule by looking to all the available data." *Allstate Ins. v. Thrifty Rent-A-Car Sys., Inc.*, 249 F.3d 450, 454 (6th Cir. 2001). Under this analysis, state appellate-court decisions should "not be disregarded" unless there appear to be persuasive reasons the supreme court "would decide otherwise." *Id.* (quoting *Kingsley Assocs. v. Moll PlastiCrafters, Inc.*, 65 F.3d 498, 507 (6th Cir. 1995)). The district court found the state appellate decisions unpersuasive given their lack of analysis and failure to address the statute's use of "laws" in one section, Ohio Rev. Code Ann. § 1333.67(A), and "remedies" in the other, *id.* § 1333.67(B)(1).

---

[4] In addition to the plain text of the statute, the district court relied on the preemption approach outlined by this court in *Stolle Machinery Co., LLC v. RAM Precision Industries*, 605 F. App'x 473 (6th Cir. 2015). In *Stolle Machinery*, the court held that "state-law claim[s]" are preempted by the OUTSA if they "are no more than a restatement of the same operative facts" forming the basis of the plaintiff's OUTSA misappropriation claim. 605 F. App'x at 485 (internal quotations omitted). This analysis, however, came in the context of assessing tort claims—the plaintiff in *Stolle Machinery* appealed the district court's ruling that the OUTSA preempted its claims for conspiracy to misappropriate trade secrets and tortious interference. *Id.* at 484. The *Stolle Machinery* court did not address or purport to extend its holding to contract claims.

13

The district court's interpretation of the preemption provision is unconvincing for several reasons. For one, it functionally reads Section 1333.67(B)(1) out of the statute, contrary to the principle that courts should avoid constructions that render statutory provisions inoperative. *See Hibbs v. Winn*, 542 U.S. 88, 101 (2004); *State v. Hollinghead*, 214 N.E.3d 1233, 1240 (Ohio Ct. App. 2023). The district court did not explain how the OUTSA can preserve contractual remedies while preempting contractual claims—the vehicle for establishing a party's right to the remedies. Additionally, the district court's determination that contractual remedies are precluded unless they differ from those available under the OUTSA is not grounded in the statute's text, which exempts contractual remedies without limitation.

Instead, the more natural reading of Section 1333.67(B) is that by excluding certain "remedies" from preemption, the statute also excludes the claims creating them. Section 1333.67(A) displaces specified laws "providing civil remedies" for trade-secret misappropriation, "[e]xcept as provided in division (B) of this section." Ohio Rev. Code Ann. § 1333.67(A). This indicates, first, that the preemption of laws in division (A) turns on their providing civil remedies for misappropriation of trade secrets and, second, that the two divisions must be read in conjunction. The use of "remedies" in the preemption clause should therefore inform the operative meaning of "remedies" in the exclusion clause. *See State ex rel. Ohio Hist. Connection v. Moundbuilders Country Club Co.*, 220 N.E.3d 678, 684 (Ohio 2022) ("We must discern the ordinary meaning of a statutory term not just by its general use in common parlance but also by 'its placement and purpose in the statutory scheme.'" (quoting *Bailey v. United States*, 516 U.S. 137, 145 (1995))); *see also Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019) ("In statutory interpretation disputes, a court's proper starting point lies in a careful examination of the ordinary meaning and structure of the law itself.").

The term "remedies" in division (A) is placed in the context of laws providing claims for remedies for misappropriation of trade secrets. Reading divisions (A) and (B) together then, tort, restitutionary, and other laws are displaced "[e]xcept" if they provide "civil remedies that are not based on misappropriation of a trade secret." Ohio Rev. Code Ann. § 1333.67(A), (B)(2). And all contractual and criminal remedies "whether or not based on misappropriation of a trade secret" are unaffected by the OUTSA. *Id.* § 1333.67(B)(1), (B)(3). Notably, the statute does not purport to displace contractual remedies that are also recoverable under other laws. Accordingly, the most natural reading of § 1333.67 is that division (A) broadly preempts claims based on misappropriation, while division (B) excludes all contract and criminal claims "whether or not based on misappropriation of a trade secret," and all other claims "not based on misappropriation of a trade secret."

Further, the district court's interpretation is an outlier among courts that have interpreted similar state-law provisions. The OUTSA is Ohio's iteration of the Uniform Trade Secrets Act (UTSA), promulgated by the National Conference of Commissioners on Uniform State Law in 1979 and in revised form in 1985. *See Allied Erecting & Dismantling Co. v. Genesis Equip. & Mfg., Inc.*, 805 F.3d 701, 703 (6th Cir. 2015); *Imaginative Rsch. Assocs., Inc. v. Ramirez*, 718 F. Supp. 2d 236, 248 (D. Conn. 2010). Ohio adopted the 1985 version of the UTSA "with only minor changes." *Allied Erecting & Dismantling Co.*, 805 F.3d at 703. By Metron's count, thirty-four other states have adopted versions of the UTSA, and the Ohio act instructs that it is to be "applied and construed to effectuate [the statute's] general purpose to make uniform" trade-secrets-misappropriation law across those jurisdictions. Ohio Rev. Code Ann. § 1333.68. The vast majority—if not all—of courts interpreting various states' iterations of the UTSA have held they do not preempt breach-of-contract claims. *See, e.g.*, *Integral Dev. Corp. v. Tolat*, 675 F. App'x

15

700, 704 (9th Cir. 2017); *Harvey Barnett, Inc. v. Shidler*, 200 F. App'x 734, 740 n.5 (10th Cir. 2006); *Hecny Transp., Inc. v. Chu*, 430 F.3d 402, 404 (7th Cir. 2005); *BlueEarth Biofuels, LLC v. Hawaiian Elec. Co*., 235 P.3d 310, 319 (Haw. 2010); *Angelica Textile Servs., Inc. v. Park*, 163 Cal. Rptr. 3d 192, 203 (Cal. Ct. App. 2013); *Aon Risk Servs. v. Liebenstein*, 710 N.W.2d 175, 192 (Wis. Ct. App. 2006), *abrogated on other grounds by Burbank Grease Servs., LLC v. Sokolowski*, 717 N.W.2d 781 (Wis. 2006); *see also* Appellant Br. at 20 n.34 (collecting cases). Other than the district court's opinion in this case, defendants have not identified any case to the contrary.[5]

Finally, the UTSA's commentary supports the Ohio Court of Appeals' reading of the preemption provision. The comment to the UTSA's preemption provision states: "[This Act] applies to a duty to protect competitively significant secret information that is *imposed by law*. It does not apply to a duty voluntary assumed through an express or an implied-in-fact contract." Uniform Trade Secrets Act, § 7 (1985) (emphasis added). Limiting preemption to claims stemming from duties imposed by law was consistent with the UTSA's purpose of "harmoniz[ing] and clarify[ing] the law of trade secrets." *Ramirez*, 718 F. Supp. 2d at 248 (quoting Ramon A. Klitzke, *The Uniform Trade Secrets Act,* 64 Marq. L. Rev. 277, 277 (1980)). "Because privately negotiated contractual obligations are applicable only to the parties to a contract, they do not create . . . variance in 'duties imposed by law.'" *Id.* at 249; *see Corporex Dev. & Constr. Mgmt., Inc. v. Shook, Inc.*, 835 N.E.2d 701, 704 (Ohio 2005) (distinguishing between contractual obligations and duties imposed by tort law).

---

[5] Two recent law review articles have surveyed interpretations of the UTSA, and neither make any note of courts interpreting UTSA's contract provision otherwise. *See* Warrington S. Parker III & Daniel D. Justice*, The Differing Approaches to Preemption Under the Uniform Trade Secrets Act*, 49 Tort Trial & Ins. Prac. L.J. 645 (2014); John T. Cross, *UTSA Displacement of Other State Law Claims,* 33 Hamline L. Rev. 445 (2010). To the extent there is any disagreement about contract displacement, courts have disagreed whether UTSA's savings clause applies to tortious-interference-with-a-contract claims. *See* Cross*, supra*, at 465–66. And even then, the majority find no preemption—which strongly suggests that core contract claims (vs. tort-adjacent ones) are not displaced either. *Id.*

Neither the district court nor Defendants have identified persuasive reasons the Ohio Supreme Court would reject the Ohio Court of Appeals' interpretation of Section 1333.67(B)(1). *See Allstate Ins.*, 249 F.3d at 454. We therefore conclude that Metron's breach-of-contract claim is not preempted by the OUTSA.

## B. Defendants' Alternative Arguments for Summary Judgment

Defendants offer alternative bases for affirming the grant of summary judgment on the breach-of-contract claim. *See Kennedy v. Superior Printing Co.*, 215 F.3d 650, 655 (6th Cir. 2000). They argue that, even if Metron's claim is not preempted, summary judgment is warranted because Metron has failed to establish that (a) Defendants breached their MCAs, and (b) the breaches caused Metron's claimed damages. We conclude that factual disputes concerning breach and damages preclude summary judgment.

### 1. Breach by Adams

Adams argues that Metron has no evidence that he breached the MCA by disclosing confidential information. The MCA required "[e]ach party . . . to protect the confidentiality of the Confidential Information of the other in the same manner that it protects the confidentiality of its own proprietary and confidential information of like kind." R.3-3, PID 172–73. It further prohibited the copying or reproduction of confidential information "without the disclosing party's prior written consent." *Id.*, PID 173. Adams argues there is no evidence he violated this provision because he did not contribute to the drafting of the Cook-EnTox Application and instructed Cook not to use non-public information.

However, Adams does not dispute that he hired and paid the patent attorney who helped Cook file the Cook-EnTox Patent Application. And a jury could infer from the circumstances of the drafting, which took place at Adams's offices with Adams's attorney present throughout the

drafting, that Adams was aware Cook relied on Metron's documents. Cook testified that Adams pressured her into drafting the patent, which she did over the course of one or two days; that Adams knew Thomas had provided Cook with Metron documents; that she informed Adams's attorney that she used Metron's documents in drafting the patent and that Adams may have been in the room when she did so; and that Adams reviewed the patent and was present when it was filed. From these facts, a reasonable jury could conclude that Adams failed to protect or participated in the unauthorized copying of Metron's confidential information in violation of the MCA.[6]

### 2. Breach by Cook and Thomas

Cook and Thomas argue that they did not breach their MCAs because, although the MCAs required the parties to protect confidential information, the agreements did not "prohibit or limit either party's use of information (including, but not limited to, ideas, concepts, know-how, techniques, and methodologies), . . . which is or becomes publicly available through no breach of this Confidentiality Agreement." R.3-1, PID 167.[7] Cook and Thomas argue that, because the PCT Application ultimately did become publicly available, it was not confidential information subject to the MCA.

---

[6] Adams also argues that Metron cannot prove its damages are attributable to him because the district court found, and Metron does not dispute, that he had no involvement in the manufacturing, distribution, or sale of Vitality Detox Drops and Clean Slate. But Metron does not rely on any involvement in product distribution for its damages against Adams; instead, it argues that the causal link between Adams's conduct and Metron's damages is Adams's involvement in the drafting and pursuit of the Cook-EnTox Patent.

[7] Cook and Thomas also argue that the PCT Application did not constitute "confidential information" as defined by the MCAs because it was not distinctive, and was therefore widely known. The MCA's definition, however, does not require distinctiveness. Instead, it defined confidential information to include "any and all information" disclosed by the parties while evaluating a potential business relationship with each other. R.3-1, PID 166. And the PCT Application otherwise meets the MCA's broad definition, which includes Metron's "techniques, . . . processes, procedures," and "any information provided by Metron which references any . . . Metron product related process including but not limited to process [sic] involving water-soluble hydrolyzed clinoptilolite fragments." *Id.*

We are not convinced. We read the provision as allowing Defendants to use the PCT Application after its April 2016 publication. Given the provision's use of "becomes" as opposed to "will become," it did not render the Application non-confidential before publication. Metron argues that Thomas's and Cook's breaches are connected to the pre-publication drafting of the Cook-EnTox Patent Application in October 2015, thus summary judgment on the breach-of-contract claim was not warranted based on the PCT Application's eventual publication.

### 3. Causation of Damages

Finally, Cook and Thomas argue that summary judgment should be granted because, given the timing of the PCT Application's publication, Metron cannot show that any breach on their part caused Metron's damage. Because there is a factual dispute concerning whether the purported damages Metron suffered after the application's publication stem from Defendants' actions before it was published, summary judgment was not warranted on this basis.

Metron's claimed damages primarily consist of the lost profits it contends it suffered due to competition with the Vitality Detox Drops and Clean Slate products. It also seeks to recover the legal fees it incurred challenging the Cook-EnTox Patent. Metron argues that Defendants' breach of their MCAs caused these damages because it enabled them to file and obtain the Cook-EnTox Patent; the patent application and patent, in turn, allowed Cook and Thomas to market Vitality and Clean Slate as "patent pending" and then "patented," making the products more competitively viable.

Cook and Thomas, however, emphasize that the record indicates the products Metron contends caused its damages entered the market in May 2016 at the earliest, when Vitality Detox Drops were first sold. Clean Slate then came on the market in 2018 or 2019, and Metron did not challenge the Cook-EnTox Patent until 2021. Because the MCA did not preclude use of publicly

19

available information, Cook and Thomas argue that Metron's claimed damages stem from actions they "had the undisputed right to take." Cook Br. at 54. And they argue that Metron has not shown that the prosecution of the Cook-EnTox Patent "would have proceeded differently" if Defendants had complied with the MCA and filed their application in April 2016. *Id.* In other words, Defendants claim that Metron has not shown its damages "would not have occurred had the defendant performed the promises which he made in the contract," or that their breaches were a "substantial factor" in its damages. *Claris, Ltd. v. Hotel Dev. Servs., LLC*, 104 N.E.3d 1076, 1084, 1087 (Ohio Ct. App. 2018) (citation omitted).[8]

But Metron does not argue that Defendants' actions after April 2016—the manufacture, sale, and marketing of clinoptilolite products—violated the terms of the MCA. Rather, it argues that Cook and Thomas violated the MCAs by drafting the Cook-EnTox Patent Application using confidential information before the PCT Application's publication. The Cook-EnTox Patent Application, which allowed Defendants to market their product advantageously, then gave Vitality Detox Drops and Clean Slate a status in the market that sapped Metron's profits, *i.e.*, caused its damages. Even if Metron's claimed damages manifested after the publication, they still resulted from actions that occurred before the publication.

And although Metron might have incurred the same expenses challenging Defendants' patent had Defendants filed their application after the PCT Application was published, summary

---

[8] Plaintiffs must show that "the defendant's breach was a substantial factor" in causing their damages when their "total injury may have been the result of many factors." *Claris, Ltd.*, 104 N.E.3d at 1087 (quoting *Cammerer Farms v. Terra Int'l Inc.*, No. CA91-02-020, 1991 WL 274322, at *3 (Ohio Ct. App. Dec. 23, 1991)). Cook and Thomas briefly argue that Metron cannot demonstrate that any breach on their part caused its lost profits because of "the crowded market space for clinoptilolite." Cook Br. at 55; *see* R.156-1, PID 4959 (Tsirikos-Karapanos deposition testimony that there are "many" other zeolite suspension products sold in the U.S. and Europe). Although it is possible that Metron's purported lost profits resulted from competitors other than Defendants' companies, the attestation of Metron's distributor that Defendants' patent-related marketing claims are both rare and make their products strongly competitive creates a factual dispute on this issue.

judgment is not warranted based on this proffered scenario. Defendants cite no evidence establishing that, had they chosen to comply with the MCAs, they still would have filed a patent derivative of Metron's in April 2016; nor have they established that the prosecution of a hypothetical, non-breaching patent would have proceeded in the same manner the Cook-EnTox application did.

Cook and Thomas's characterization of the breach as, at worst, "the filing of the Cook-Entox Application in October 2015 as opposed to April 2016" also does not invalidate Metron's damages-causation theory. Cook Br. at 54. Vitality Detox Drops entered the market seven months after Defendants drafted and filed the Cook-EnTox Patent Application. It is reasonable to infer that product development would have unfolded along a similar timeline if Defendants had waited until April 2016 to file their patent application, and products resulting from a non-breaching patent application would have entered the market in November 2016 at the earliest. Metron has therefore established, at the very least, a question of fact as to whether it faced competition and lost profits between May 2016 and November 2016 that it would not have absent Cook and Thomas's breach. That Metron's purported damages materialized after April 2016 when the MCA would have permitted copying the PCT Application does not establish that those damages did not result from an earlier breach.

We accordingly conclude that summary judgment was not warranted on Metron's breach-of-contract claim.

## V.

Metron brings a claim for trade-secret misappropriation under the OUTSA against Cook, Thomas, Adams, and the corporate Defendants (Root, EnTox, and Top Partners). It argues that the PCT Application was a trade secret that Defendants misappropriated through the drafting and

filing of the Cook-EnTox Patent Application and by using that application and resulting patent in their marketing of competing clinoptilolite products.

The district court granted summary judgment to Cook and Thomas on Metron's OUTSA claim on the basis that it was not brought within the statute of limitations.[9] It granted summary judgment for Adams and the corporate Defendants on the basis that the PCT Application was not a trade secret due to lack of "independent economic value." R.171, PID 7265–68. Metron challenges both decisions. Defendants argue that the court correctly decided both issues and offer three additional bases for affirming summary judgment.

## A. Statute of Limitations (Cook and Thomas)

The OUTSA requires that a misappropriation claim be brought "within four years after the misappropriation is discovered or by the exercise of reasonable diligence should have been discovered." Ohio Rev. Code. Ann. § 1333.66; *see also id.* ("For the purposes of this section, a continuing misappropriation constitutes a single claim."); *Kehoe Component Sales Inc. v. Best Lighting Prod., Inc.*, 796 F.3d 576, 583 (6th Cir. 2015) ("OUTSA's limitations period runs not from each time that a trade secret is used, but from the first moment of its reasonably discoverable misappropriation."). "'Discovery' as used here requires 'knowledge of such facts as would lead a fair and prudent [person], using ordinary care and thoughtfulness, to make further inquiry.'" *Adcor Indus., Inc. v. Bevcorp, LLC*, 252 F. App'x 55, 60 (6th Cir. 2007) (quoting *Hambleton v. R.G. Barry Corp.*, 465 N.E.2d 1298, 1300–01 (Ohio 1984)).

---

[9] Root contends in its brief that the district court also found that Metron's OUTSA claim against Root was time-barred. It did not. Although Defendants argued that their arguments on behalf of Thomas and Cook equally applied to Root because Metron's claims against Root were "contingent or agency claims" based on Cook and Thomas's actions, R.159-1, PID 6477, the district court held that the OUTSA claim was time-barred against Cook and Thomas only. As Defendants emphasized in their motion, Root did not exist until 2019. Although Metron arguably could have had knowledge of Thomas's actions in 2016, it could not have had knowledge of an entity that did not yet exist, even if Thomas later acted through that entity.

"Because the statute of limitations is an affirmative defense, the burden is on the defendant to show that the statute of limitations has run." *Campbell v. Grand Trunk W. R.R. Co.*, 238 F.3d 772, 775 (6th Cir. 2001); *see Evans v. S. Ohio Med. Ctr.*, 659 N.E.2d 326, 329 (Ohio Ct. App. 1995) (citing *Velotta v. Petronzio Landscaping, Inc.*, 433 N.E.2d 147, 150 (Ohio 1982)). "Application of a statute of limitations presents a mixed question of law and fact; when a cause of action accrues is a question of fact, but in the absence of a factual issue, application of the limitations period is a question of law." *Schmitz v. NCAA*, 122 N.E.3d 80, 85 (Ohio 2018); *see Tausch v. Riverview Health Inst.*, 931 N.E.2d 613, 622 (Ohio Ct. App. 2010) (holding that summary judgment is inappropriate when there is a question of fact whether plaintiff should have discovered the injury earlier).

Metron filed its initial complaint in this action on July 13, 2020, within four years of the Cook-EnTox Patent Application's publication on April 20, 2017. Defendants, however, argue, and the district court agreed, that Metron should have discovered the alleged misappropriation in 2016 before the patent application's publication. In February 2016, Metron filed a lawsuit in state court against Thomas and one of his companies, Personalized Healthcare Solutions, LLC, that included allegations of trade-secret misappropriation in violation of the OUTSA. Metron made two specific allegations of misappropriation: that Thomas contacted a Metron investor in September 2015 "and sought his backing and support to 'knock off' Metron's patent so as to manufacture a similar product," and "surreptitiously contacted" Metron's intellectual property attorneys in October 2015 in an attempt to obtain information about Tsirikos-Karapanos's patents. R.157-5, PID 6173. It also accused Thomas of publishing Metron's trade secrets on his website, without describing the objectionable information. Therefore, Defendants argued, Metron either discovered or should have discovered Defendants' alleged misappropriation in February 2016.

The district court determined that Metron's "present lawsuit makes materially similar allegations" to the 2016 complaint, and Metron's suspicions that Thomas was pursuing a "knock off" patent were well-grounded enough to obligate it "to investigate further." R.171, PID 7260, 7263. Specifically, given Metron's knowledge of Thomas and Cook's personal and professional relationships, it should have investigated Cook's involvement. The district court said that Metron's own "litigiousness" provided Cook and Thomas with a successful statute-of-limitations defense, as Metron had demonstrated "its willingness to use and abuse the legal system." *Id.*, PID 7263.

The district court viewed Metron's argument that the statute of limitations did not begin to run on the filing of its 2016 lawsuit as seeking "authorization for serial litigation involving the same claims and operative facts." *Id.* We disagree. Although Metron's Amended Complaint in this case also alleges that Thomas's email to the investor was part or evidence of a misappropriation scheme, the operative facts in this lawsuit are different. In the 2016 litigation, Metron had a suspicion—based on two rebuffed attempts to obtain information or backing from Metron's investors and attorneys—that Thomas was attempting to knock off its patents. Here, Metron relies on evidence that Defendants copied a specific Metron document, used that document to draft their own patent, and used that patent to develop and market products.

Further, the district court did not explain what investigative steps Metron should have taken between February 2016 and April 2017 to discover these facts or more generally ascertain whether Thomas and Cook were in fact misappropriating its trade secrets. The Cook-EnTox Patent Application was not publicly available until its publication in April 2017. *See* 35 U.S.C. § 122(a). And, as the district court acknowledged, the 2016 state-court lawsuit ended without discovery. In one case cited by the district court, plaintiffs investigated alleged misappropriation by inspecting

24

the defendants' products. *New Tech. Prods. Pty Ltd. v. Scotts Miracle-Gro Co.*, 2022 WL 13705934, at *18 (Ohio Ct. App. Oct. 24, 2022). Defendants here cite no evidence that Metron could have determined through inspection, or gained adequate notice through testing, that Vitality and Clean Slate were produced using the hydrolysis process described in its PCT Application or that Cook's patent applications were based on the PCT Application.

Because there are genuine factual disputes concerning whether Metron could have discovered Cook and Thomas's alleged misappropriation before the 2017 publication of the Cook-EnTox Patent, Defendants have not met their summary judgment burden.

## B. Independent Economic Value (Adams and Corporate Defendants)

After concluding that Metron's OUTSA claim against Cook and Thomas was time-barred, the district court then analyzed the claim on the merits against Adams and the corporate Defendants (Root, EnTox, and Top Partners). The elements of an OUTSA trade-secrets-misappropriation claim are: "(1) the existence of a trade secret; (2) acquisition of the trade secret as the result of a confidential relationship or through improper means; and (3) an unauthorized use of the trade secret." *Novus Grp., LLC v. Prudential Fin., Inc.*, 74 F.4th 424, 427–28 (6th Cir. 2023). The district court concluded that Metron had failed to show that the PCT Application constituted a trade secret within the OUTSA's definition, and granted summary judgment to Adams and the corporate Defendants.

### 1. Statutory Definition of a Trade Secret

Metron bears the burden of showing that the PCT Application meets the OUTSA's definition of a trade secret. *State ex rel. Besser v. Ohio State Univ.*, 732 N.E.2d 373, 378 (Ohio 2000). That definition is:

> [I]nformation, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation,

25

program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Ohio Rev. Code Ann. § 1333.61(D).

The Ohio Supreme Court uses six factors to evaluate whether a claimed trade secret meets this definition:

(1) The extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, *i.e.*, by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information.

*Besser*, 732 N.E.2d at 378 (quoting *State ex rel. The Plain Dealer v. Ohio Dep't of Ins.*, 687 N.E.2d 661, 672 (Ohio 1997)). Whether particular information constitutes a trade secret is a question of fact. *Valco Cincinnati, Inc. v. N & D Machining Serv., Inc.*, 492 N.E.2d 814, 819 (Ohio 1986).

### 2. Analysis

The district court concluded that Metron failed to establish the first element of a misappropriation claim—existence of a trade secret—because it did not show the information in the PCT Application derived independent economic value from not being generally known or readily ascertainable. Although "novelty in the patent law sense is not required," information must be "unique and competitively advantageous" to constitute a trade secret. *Murray v. Bank One*, 649 N.E.2d 1307, 1312–13 (Ohio Ct. App. 1994). And information "generally known in the industry . . . is not secret and cannot qualify as a trade secret." *Id.* at 1313 (internal quotations omitted).

26

The district court based its conclusion on Tsirikos-Karapanos's testimony that there are "many" clinoptilolite suspension products on the market in the United States and Europe. R.171, PID 7265 (citing R.156-1, PID 4959). According to the district court, the existence of similar products demonstrates that the application's "underlying information" was known to those in the industry. *Id.* The court further relied on Tsirikos-Karapanos's testimony that he developed his process after working on it for around six months in his "spare time," which the district court viewed as indicating competitors could likely develop their own suspension products or processes quickly. *Id.*, PID 7266 (citing R.156-1, PID 5024–25). And, Tsirikos-Karapanos "abandoned" the process after realizing it created a suspension, not a solution, undermining Metron's argument that it imparted value to the holder against competitors. *Id.*, PID 7267.

This evidence is not sufficient to establish, without dispute, that the PCT Application lacked independent economic value. As Metron argues, the presence of other clinoptilolite suspension *products* on the market does not establish that Metron's *process* specifically was widely known. And contrary to Defendants' assertions, there is other evidence in the record supporting the inference that Metron's process is distinctive compared to those in other clinoptilolite products on the market. When Tsirikos-Karapanos first developed the process he thought, albeit when using LHS's "limited and very low quality" equipment, R.156-1, PID 4890, that it yielded a solution. He testified that although he was mistaken, it did produce a "good quality suspension." *Id.* That testimony supports the inference that the PCT Application process produced a higher-quality suspension closer enough to a solution to be potentially valuable. And although Metron did not develop products using the two-step process, Tsirikos-Karapanos characterized the process as the "foundational basis" for his improved one-step process. *Id.*, PID 4968. In other ways, too, the patent application presumably derived "actual or potential" value from not being

generally known. For instance, premature access to the patent application would provide competitors a window into Metron's business plans, affording them a substantial economic advantage. *See State ex rel. The Plain Dealer*, 687 N.E.2d at 674–76 (considering "economic value to a competitor," including if they knew about "proposed business venture[s]").

Cook and Thomas's argument that Cook's reliance on the PCT Application in drafting the Cook-EnTox Patent does not demonstrate its independent economic value, "since a drafting aid can equally be used for such purpose whether it is confidential or not," is also not persuasive. Cook Br. at 32; Thomas Br. at 32. When the Cook-EnTox Patent was drafted, the PCT Application had been kept confidential. By relying on it, Cook was able to draft her patent quickly and without conducting her own experiments, despite lacking Tsirikos-Karapanos's pharmacy and research background. And the Cook-EnTox Patent copied not just background information, but the substance of the three-step process Tsirikos-Karapanos developed over months. These facts support an inference that the PCT Application's confidentiality did in fact create independent economic value by preventing competitors from quickly developing their own clinoptilolite products on a greatly accelerated timeline while it was still unpublished. *See State ex rel. The Plain Dealer*, N.E.2d at 674–75 (considering whether the relevant information would "afford a party a competitive advantage").

## C. Defendants' Alternative Arguments for Summary Judgment

Defendants argue there are several alternative bases for granting summary judgment beyond the PCT Application's supposed lack of independent economic value. They argue that the district court's grant of summary judgment can be affirmed for the corporate Defendants (Root, EnTox, and Top Partners) because Metron abandoned its claims against them; for the Adams Defendants (Adams, EnTox, and Top Partners) because Metron has failed to establish that their

conduct constituted misappropriation; and for Cook, Thomas, and Root because the PCT Application's publication removes it from trade-secret status.

### 1. Abandonment of Claims Against Corporate Defendants

Root, EnTox, and Top Partners argue Metron abandoned its claims against them on appeal because its opening brief does not make specific factual or legal arguments concerning those Defendants. *See, e.g.*, *Mbonga v. Garland*, 18 F.4th 889, 899 (6th Cir. 2021) (appellants abandon claims they fail to raise in their opening briefs). Rather than addressing each corporate Defendant's OUTSA liability individually, Metron argues that the district court erred when it granted summary judgment in favor of Defendants collectively.

The district court framed its decision as applying "equally to all Defendants," R.171, PID 7268, and granted summary judgment on the basis that Metron's claim failed on the first element—the existence of a trade secret. The focus of the district court's analysis was therefore not on the conduct of the individual Defendants and whether that conduct differed in legally significant ways, but on the characteristics of the PCT Application. Differences between the Defendants' alleged conduct may be relevant to the second and third elements of Metron's claim—concerning the acquisition and use of the purported trade secret—but the district court did not reach that part of the analysis. So although appellants forfeit issues raised "in a perfunctory manner, without some effort to develop an argument," Metron did not need to make separate arguments regarding each Defendant to adequately argue that the district court erred as to all Defendants. *Williamson v. Recovery Ltd. P'ship*, 731 F.3d 608, 621 (6th Cir. 2013).

### 2. Evidence that Adams Defendants Misappropriated Metron's Trade Secrets

Adams, EnTox, and Top Partners argue that Metron has not established that they misappropriated, *i.e.*, "improperly acquired or used," its purported trade secrets. The OUTSA defines misappropriation as:

> (1) Acquisition of a trade secret of another by a person *who knows or has reason to know* that the trade secret was acquired by improper means; [or]
>
> (2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:
>
>> (a) Used improper means to acquire knowledge of the trade secret;
>>
>> (b) At the time of disclosure or use, *knew or had reason to know* that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;
>>
>> (c) Before a material change of their position, *knew or had reason* to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

Ohio Rev. Code Ann. § 1333.61(B) (emphasis added). "'Improper means' include[] theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." *Id.* § 1333.61(A).

The Adams Defendants argue that Metron has failed to show they knew the Cook-EnTox Patent Application relied on information Cook or Thomas had improperly acquired from Metron and that their conduct therefore constituted misappropriation. Metron points to two pieces of testimony it contends establish Adams's, and therefore EnTox's and Top Partners', knowledge. *See Arcanum Nat'l Bank v. Hessler*, 433 N.E.2d 204, 211 (Ohio 1982) (an officer's knowledge is imputed to the corporation under Ohio law).

First, Cook testified that Adams knew Thomas had previously given her information from Metron, and Adams testified that he knew Thomas might be subject to a confidentiality agreement with Metron. Second, Cook was asked during her deposition whether she told Adams or any of the members of EnTox that her draft patent application relied on Metron documents. She responded "[y]eah," but her full answer left unclear whom precisely she told: "[t]heir attorney they hired – I didn't hire the attorney. It [the attorney] was Ross. So I disclosed that and said, [s]ome of this information is from Metron . . . . So that was absolutely discussed." R.156-2, PID 5732. When asked to clarify if she disclosed that information to Adams or other specific individuals, she responded: "I don't remember what I said to them. They were in there part of the time when I talked to the attorney." *Id.* She also said Adams was present when the patent was filed. *See also supra* Part IV.B.1.

Viewing these facts in the light most favorable to Metron, it is reasonable to infer that Adams participated in or was aware of this discussion, which took place in his offices, at his behest, and involved his attorney. A reasonable jury could therefore find that the Adams Defendants' participation in the filing of the Cook-EnTox Patent Application amounted to "disclosure or use" of a trade secret they "knew or had reason to know" had been improperly acquired. Ohio Rev. Code Ann. § 1333.61(B). Accordingly, the Adams Defendants are not entitled to summary judgment on this basis.

### 3. Effect of the PCT Application's Publication

Cook, Thomas, and Root argue that summary judgment is also warranted on Metron's misappropriation claim because, as shown by the PCT Application's eventual publication, Metron did not take reasonable efforts to preserve its secrecy. *See* Ohio Rev. Code Ann. § 1333.61(D)(2)

(defining a trade secret as information "subject [to] efforts that are reasonable under the circumstances to maintain its secrecy").

We reject the argument that the PCT Application's publication in April 2016 deprived it of any trade-secret status before that date, while it was still unpublished. "Once material is publicly disclosed, it loses any status it ever had as a trade secret." *State ex rel. Lucas Cnty. Bd of Comm'rs v. Ohio Env't Prot. Agency*, 724 N.E.2d 411, 419 (Ohio 2000) (quoting *State ex rel. Rea. v. Ohio Dep't of Educ.*, 692 N.E.2d 596, 601 (Ohio 1998)) (internal alteration omitted). Therefore, "there is no trade-secret protection for confidential information that is disclosed in a public patent application," and the trade secret is "extinguished" once the application is in the public domain. *Rogers Indus. Prods., Inc. v. HF Rubber Mach., Inc.*, 936 N.E.2d 122, 126 (Ohio Ct. App. 2010) (quotation omitted). However, confidential information does not lose trade-secret status until "*after it is disclosed to the general public in a published patent application.*" *Id.* at 127 (emphasis added).

Metron has established evidence of reasonable efforts to maintain the PCT Application's secrecy before April 2016. In addition to relying on the patent office's obligation to keep the application confidential prior to its publication, Tsirikos-Karapanos testified that within Metron the application was disclosed only to his patent attorney and Thomas. Metron further protected the application through its regular practice of requiring business associates to execute MCAs. And prior to its publication, Metron had the ability to withdraw it and request non-publication. Therefore, the fact that Metron "never planned for the PCT Application . . . to *remain* confidential," does not prevent it from qualifying as a trade secret while it still was. Cook Br. at 44 (emphasis

added).[10]    The application's later publication therefore does not provide a basis for affirming summary judgment in favor of Cook and Thomas.

However, once the PCT Application was published, any trade secret status was "extinguished," and Metron therefore cannot premise a misappropriation claim on conduct occurring after April 2016.[11]  *Rogers Indus. Prods., Inc.*, 936 N.E.2d at 126 (quotation omitted). Because Root was not formed until July 2019, Metron cannot show it misappropriated a trade secret.  We therefore affirm the grant of summary judgment in favor of Defendant Root on this alternative ground.

## VI.

Finally, Metron argues that the district court's grant of summary judgment should be vacated because it was motivated by the court's bias against and hostility towards Metron. Although it cites cases analyzing judicial bias and hostility as a due process violation, Metron argues that the district court's ruling constituted "a veiled sanction against Metron . . . to which Metron had no reasonable opportunity to respond" in violation of Federal Rule of Civil Procedure 11.  Appellant Br. at 46.  Regardless of the argument's framing, the statements by the district court that Metron considers objectionable do not indicate a level of hostility requiring reversal or vacatur.

---

[10] Cook further argues that the two-step process described in the PCT Application was also outlined in the provisional patent application, and that Metron ensured the provisional application's publication by filing non-provisional patents (the patents based on the improved, one-step process) claiming the provisional application's priority date.  However, these filings did not result in the provisional application publishing before April 2016, and did not render the two-step process non-confidential prior to the publication of the PCT Application.

[11] The OUTSA makes damages available for actual loss and unjust enrichment "caused by misappropriation."  Ohio Rev. Code Ann. § 1333.63.  Whether Metron can show that Defendants' alleged misappropriation prior to April 2016, *i.e.*, the drafting of the Cook-EnTox Patent, caused damages after that date remains an open question.

### A. The District Court's Statements

Metron focuses on statements in the district court's summary judgment decision and its order denying Metron's motion for civil contempt and renewed motion for a preliminary injunction that Metron asserts constitute "gratuitous attacks" demonstrating the court's hostility and lack of impartiality. Appellant Br. at 40. Metron finds two portions of the district court's summary judgment ruling, emphasized below, objectionable:

> In short, Plaintiff's *litigiousness* gives rise to the time-bar defense that Ms. Cook and Mr. Thomas successfully advance. *The record demonstrates its willingness to use and abuse the legal system.* Plaintiff's failure to vindicate its rights when it had the chance bars its claims against Ms. Cook and Mr. Thomas as untimely.

R.171, PID 7263 (emphasis added and citations omitted). The examples of Metron's "use and abuse" of the legal system cited by the district court include motions Metron filed in these proceedings for contempt and sanctions against Thomas and for the disqualification of Root's counsel Kline Preston, as well as separate state-court lawsuits Metron filed against Thomas and Adams.

Metron objects to the district court's characterization of these filings as possible "abuses," maintaining that it had meritorious bases for all of them—as the district court sometimes acknowledged. Metron notes that the district court granted its first motion for contempt and sanctions against Thomas in part. And it notes that although the district court denied its motion to disqualify Preston on the basis that he might be called as a fact witness because he shared office space with certain Defendants and served on Root's management team, it acknowledged that disqualification might become "appropriate or necessary" as the case developed. R.111, PID 3225. As for the state-court cases against Adams and Thomas, Metron argues the district court had too little information about the Adams litigation to assess whether it was frivolous and emphasizes

that it was awarded a default judgment, money damages, and injunctive relief in its suit against Thomas.

As for the second set of statements Metron finds objectionable, the district court expressed considerable frustration with both sides in its order denying Metron's second motion for contempt and a preliminary injunction. In its motion, Metron argued that Thomas took two actions that warranted civil contempt. The district court had previously granted Metron's request for a preliminary injunction enjoining Thomas from, *inter alia*, making public statements "that in any way disparage, reference, allude to, or pertain to Metron Nutraceuticals, Plaintiff's members, its products, Dr. Tsirikos-Karapanos, and/or anyone in Dr. Tsirikos-Karapanos's family," and (b) disclosing "the personal financial information" of Tsirikos-Karapanos or his family. R.89, PID 2816.

Metron asserted that Thomas violated the first restriction in an April 2022 Facebook Live broadcast in which he said of Tsirikos-Karapanos and Metron's counsel, "you suck"; called Metron's counsel "guys that are a little bit gay, pedophiles, and just really bad people"; and said that in 2015 he (Thomas) worked for a "psychopath[]" who "claims to be a doctor." R.146, PID 3458. The district court concluded that "you suck," was a "crude, perhaps offensive" statement, but not a disparaging one. *Id.*, PID 3459. While the court said the statement did "violate the letter of the Court's Order," it criticized Metron for what it perceived to be a frivolous motion:

> In this regard, the Court now appreciates that its Order goes too far. One would have thought that Plaintiff's counsel would have appreciated that a statement like this that might technically violate the Order would not support such a serious motion. *Like their client, however, Plaintiff's counsel have abandoned reason and a constructive approach to resolving any good-faith disputes over the merits in favor of litigation tactics that claw and scrape for any advantage, regardless of the cost.* By separate entry, the Court will amend its prior Order to make clear that Mr. Thomas is enjoined from disparaging or talking about Metron Nutraceuticals, its members, and products and from disparaging Dr. Tsirikos-Karapanos or any member of his family. Although Mr. Thomas may say things about Dr. Tsirikos-

> Karapanos like "you suck," he would be wise not to do so. *Based on past experience with Mr. Thomas, the Court harbors grave doubts that Mr. Thomas can or will heed this advice.*

*Id.*, PID 3459–60 (emphasis added and citation omitted).[12]

The district court also denied Metron's motion based on purported misrepresentations and disclosures relating to the Tsirikos-Karapanos family's financial information. Although it "strongly condemn[ed]" some of Thomas's conduct, it determined that Metron "play[ed] almost as fast and loose with the facts and the record." *Id.*, PID 3466. The district court concluded its order by again expressing frustration with Metron for filing the motion and both sides for their approach to the litigation:

> The Court has repeatedly made known to the parties that it will not resolve this dispute through motions for sanctions or matters collateral to the merits. In the Court's view, Plaintiff's motion is an effort to prevail in litigation through such means. The Court remains deeply troubled by the conduct of Mr. Thomas and of Metron Nutraceuticals and its counsel.

*Id.*, PID 3467.

## B. Analysis

"[W]hen a trial judge exhibits . . . open hostility and bias at the beginning of a judicial proceeding . . . , it follows that the judgment entered therein must be reversed." *Anderson v. Sheppard*, 856 F.2d 741, 747 (6th Cir. 1988). "Although there is no mechanical test for determining when bias and/or hostility exists," *id.*, bias is defined as "deep-seated favoritism or antagonism that makes fair judgment impossible," *Coley v. Bagley*, 706 F.3d 741, 750 (6th Cir. 2013). "[J]udicial remarks during the course of a trial that are critical or disapproving of, or even

---

[12] As for the "pedophiles" comment, the district court characterized it as not only disparaging but potentially defamatory. However, it declined to hold Thomas in contempt because its prior order had only enjoined Thomas from disparaging Tsirikos-Karapanos, not his counsel. *Id.*, PID 3460–61. Finally, the district court declined to hold Thomas in contempt for his "psychopath" comment because Metron had not established that any viewers of Facebook Live would connect that comment to Tsirikos-Karapanos. *Id.*, PID 3461.

hostile to, counsel, the parties, or their cases," are ordinarily not sufficient. *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see, e.g.*, *Lewis v. Robinson*, 67 F. App'x 914, 923 (6th Cir. 2003) ("Although the statements by the trial judge in this case clearly expressed impatience, dissatisfaction, annoyance, and also anger, and were unnecessary and perhaps uncalled for, these statements did not make fair judgment impossible."). For example, this court has found reversal necessary where a district judge, in addition to criticizing the plaintiff for "put[ting] egg on [the court's] face" by successfully winning reversal of one of its rulings, pressured the plaintiff to settle on the defendant's terms and repeatedly expressed its opinion that the plaintiff would lose at trial. *Anderson*, 856 F.2d at 747. This conduct indicated that "the district court was no longer an impartial or unbiased arbiter, but had from all outward appearances assumed the posture of an advocate." *Id.*

Here, the district court's criticisms of Metron were expressions of frustration that, while ill-advised, do not indicate an inability to be impartial. The district court's statute-of-limitations analysis, and therefore part of its summary judgment decision, was intertwined with its characterization of Metron as "litigious." However, this characterization was not purely critique or exasperation—the district court's core conclusion was that Metron's knowledge supporting its OUTSA claim in 2016 carried with it the obligation to better investigate its misappropriation suspicions and that, given its familiarity with litigation, Metron should have been aware of the potential implications of not doing so. Although the district court's view that Metron brought its statute-of-limitations problems on itself is not persuasive and its negative characterizations of Metron's conduct in its order were not fully appropriate, neither makes the district court's impartiality so questionable as to require vacatur.

This is especially so in light of the fact that in the cited examples from the contempt order, the district court coupled its criticisms of Metron with criticisms of Defendants. And we find unconvincing Metron's assertion that, having already denied Metron's motion for contempt and *sua sponte* narrowed its order enjoining Thomas from making disparaging comments, the district court granted summary judgment over a year later as a further penalty for filing a motion the court considered frivolous. In addition to the considerable temporal gap between the two orders, the district court ruled against Metron after conducting a thorough and reasoned analysis in a fifty-three-page opinion and order. Thus, the cited statements do not provide an additional basis for reversing the district court's order.

## VII.

For the reasons set forth above, we **AFFIRM** the grant of summary judgment in favor of Root, and otherwise **REVERSE** and **REMAND** to the district court for further proceedings consistent with this opinion.